UNITED STATES, Appellee,

v.

HOCK, Johann G., Private (E-1), U.S. Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

EVERHART, James R., Seaman Recruit (E-1), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

MALATERRE, Thomas L., Jr., Private (E-1), U.S. Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

MADDEN, Douglas A., Private First Class (E-2), U.S. Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

REYNA, Juan III, Private (E-1), U.S. Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

BENGE, Floyd N., Private First Class (E-2), U.S. Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

GREER, Richard E., Machinist's Mate Fireman Apprentice (E-2), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

STREET, Daniel C., Hull Technician Fireman Apprentice (E-2), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

WHITE, Lowell E., Dental Recruit (E-1), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

CAMPBELL, Jerry T., Torpedoman's Mate Seaman Apprentice (E-2), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

TORRES, Louis E., Private (E-1), U.S. Marine Corps, Appellant.

UNITED STATES, Appellee,

v.

LeCROY, Jon M., Seaman Apprentice (E-2), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

HENRIKSEN, Ronald L., Equipment Operator Constructionman Apprentice (E-2), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

HANNAH, Craig L., Seaman Apprentice (E-2), U.S. Navy, Appellant.

UNITED STATES, Appellee,

v.

COUSINARD, William H., Seaman Recruit (E-1), U.S. Navy, Appellant.

CMR Nos. 77–1595, 81–0674, 77–0993, 78–0231, 78–1647, 78–0637, 78–1457, 81–3143, 77–1520, 77–0631, 80–1161, 77–1724, 79–0117 and 79–1737.

USCMA Dkt. Nos. 63621/MC, 63543/NA, 63549/MC, 63591/MC, 63813/MC, 63817/MC, 64028/NA, 63897/NA, 63535/NA, 63242/NA, 63223/MC, 63212/NA, 63364/NA, 63280/NA and 63270/NA.

U.S. Court of Military Appeals.

Sept. 28, 1990.

For Appellants: *Lieutenant Commander Donna M. Crisalli, JAGC, USN; Lieutenant Peter Van Hartesveldt, JAGC, USN.*

\* Mr. Wright left the employ of the Court during

For Appellees: *Major Laura L. Scudder, USMC; Lieutenant William R. Sprance, JAGC, USNR; Commander Thomas W. Osborne, JAGC, USN.*

PER CURIAM:

All of these cases involve extensive delay between the time of the decision of the United States Navy Court of Military Review and the filing of a petition for grant of review with this Court. Yet all of the petitions were filed with this Court in a timely fashion following recent notice to each appellant of the right to file such petition. Accordingly, in each of these cases, the issue has arisen as to whether in some way the rights of an appellant were prejudiced because of the lengthy intervening delay. Cf. *United States v. Dunbar*, 31 MJ 70 (CMA 1990).

In the belief that similar problems might account for the delay in all of these cases, we referred them to a Special Master to receive evidence, make findings of fact, and present conclusions and recommendations. Initially, Mr. Gordon Stephen Wright, Esq.,\* and subsequently, Mr. Robert C. Mueller, Esq., of the Court's staff served in this capacity, and Mr. Mueller has now filed his report which is an appendix hereto. A copy of the Report was served on counsel for the several appellants and for the Government, and they were given an opportunity to file comments and exceptions. The Government timely filed Exceptions to portions of the Report which we have considered.

We accept this Report and adopt its findings of fact. On the basis of those findings, it is clear that none of these cases received the speedy review that was contemplated by the Uniform Code of Military Justice and is customary in military practice. It is also clear that at least part of the delay herein was caused by the administrative oversight of the Navy Appellate Review Activity.

Only two appellants made allegations of specific prejudice because of the delay.

the pendency of this proceeding.

However, the Special Master found that there was no substantial evidence to support such claims, and we fully agree with his findings.

In addition, we have carefully considered the records, pleadings, as well as the Report of the Special Master and the Government's Exceptions thereto, and conclude that the delay did not materially prejudice the substantial rights of any appellant. Art. 59(a), UCMJ, 10 USC § 859(a).

These cases are before us in two categories: those having only the appellate-delay issue, and two which have other issues. In all cases, we grant review of the issue of prejudicial delay in review, but we hold against appellants with respect thereto. In one of the two cases asserting additional issues, we grant review of all issues, reverse the decision as to sentence in part, and affirm the remainder of the decision. As to the other petition, we grant review of the delay issue, deny review of the other issue, and affirm.

Accordingly, it is by the Court this 28th day of September, 1990,

ORDERED:

That the Report of the Special Master (31 M.J. 377) is accepted, and the Special Master is discharged.

■ That on consideration of the petition for grant of review of the decision of the United States Navy Court of Military Review in the case of *United States v. Hock,* No. 63621/MC, the petition is granted. We find that the record of proceedings to suspend vacation of execution of the bad-conduct discharge is not contained in the record of trial. Such a record of proceedings is a part of a complete record of trial. *United States v. Hurd,* 7 MJ 18 (CMA 1979); *United States v. Bingham,* 3 MJ 119 (CMA 1977). Therefore, that part of the sentence extending to a bad-conduct discharge may not be affirmed. *United States v. Bingham, supra, United States v. Rozycki,* 3 MJ 127 (CMA 1977). We further find that, although appellant was discharged as a result of the action vacating the suspension, such suspension was a nullity in view of the fact that appellate review was not then complete. Art. 71(c), UCMJ, 10 USC § 871(c). In light of the passage of time following the erroneous execution of the discharge and in the interest of judicial economy, we conclude that further proceedings in this case are not warranted. Accordingly, the decision of the United States Navy Court of Military Review as to the bad-conduct discharge is reversed, and the discharge is set aside. The portion of the decision regarding the findings and so much of the sentence as provides for confinement at hard labor for 60 days, and forfeiture of $245.00 pay per month for 2 months is affirmed. All rights, privileges, and property of which appellant has been deprived by reason of the erroneous execution of the bad-conduct discharge will be restored.

That on consideration of the petition for grant of review in the case of *United States v. Greer,* No. 64028/NA, the petition is hereby granted on the issues raised by appellate defense counsel, and the decision of the United States Navy Court of Military Review is affirmed.

And, That on consideration of the petition for grant of review in the following cases:

*United States v. LeCroy,* Dkt. No. 63212/NA

*United States v. Torres,* Dkt. No. 63223/MC

*United States v. Campbell,* Dkt. No. 63242/NA

*United States v. Cousinard,* Dkt. No. 63270/NA

*United States v. Hannah,* Dkt. No. 63280/NA

*United States v. Henriksen,* Dkt. No. 63364/NA

*United States v. White,* Dkt. No. 63535/NA

*United States v. Everhart,* Dkt. No. 63543/NA

*United States v. Malaterre,* Dkt. No. 63549/MC

*United States v. Madden,* Dkt. No. 63591/MC

*United States v. Reyna,* Dkt. No. 63813/MC

*United States v. Benge,* Dkt. No. 63817/MC

*United States v. Street,* Dkt. No. 63897/NA

the petition is granted on the issue raised by appellate defense counsel, and the decision of the United States Navy Court of Military Review is affirmed.

## APPENDIX

### REPORT OF THE SPECIAL MASTER

#### I. *Statement of the Case*

##### A.

By Order of this Court dated March 19, 1990, Gordon Stephen Wright was appointed Special Master in *United States v. Hock,* No. 63,621, with direction to gather evidence through various means, including a limited hearing, "to determine the facts and circumstances relating to service of the decision of the United States Navy Court of Military Review on appellant." The Order further directed the Special Master "to submit his findings and recommendations to the Court concerning the issue of" such service.

By separate Orders of the same date, the Court ordered that two other cases—*United States v. Malaterre,* No. 63,549; and *United States v. Everhart,* No. 63,543—be referred to the Special Master to join the evidentiary inquiry ordered in *Hock, supra.* On May 22, 1990, the Court ordered similar treatment in five additional cases: *United States v. Greer,* No. 64,028; *United States v. Street,* No. 63,897; *United States v. Madden,* No. 63,591; *United States v. Benge,* No. 63,817; and *United States v. Reyna,* No. 63,813.

Before the Special Master first was appointed in *Hock,* the Court in seven other cases had set aside the decision of the U.S. Navy Court of Military Review and had remanded each case to that court to develop "an explanation from the appropriate officials within the Department of the Navy setting forth (1) the full circumstances surrounding service of the Court of Military Review's decision on appellant; and (2) the efforts made to locate appellant after the first service was unsuccessful." Further, that court was ordered to "then conduct further proceedings to determine whether appellant has suffered any harm from the delay in service of its decision." However, on June 18, 1990, this Court vacated its earlier remand order in each case and ordered similar treatment by the Special Master as it had in the eight cases already referred to him. These final seven cases were *United States v. Cousinard,* No. 63,270; *United States v. LeCroy,* No. 63,212; *United States v. Torres,* No. 63,-223; *United States v. Campbell,* No. 63,-242; *United States v. Hannah,* No. 63,280; *United States v. Henricksen,* No. 63,364; and *United States v. White,* No. 63,535.

Accordingly, a total of fifteen cases have been referred by the Court to the Special Master for the purposes set out above.

##### B.

Special Master Wright held a status conference with counsel representing all parties on May 31, 1990. As a result of that conference, on June 26 the Special Master ordered affidavits filed within 10 days by three witnesses to answer specific questions posed in each order. Those witnesses were: Colonel Charles H. Mitchell, USMC, Assistant Judge Advocate General of the Navy (Military Justice); Lieutenant Colonel Peter R. Badger, USMC (Ret.); and Holly A. Crocker, Esq, formerly a major in the U.S. Marine Corps. Those affidavits were timely filed on or before August 6, 1990.

By Order of the Court dated August 6, 1990, I was appointed Special Master in all subject cases vice Gordon Stephen Wright. On that same date, I held a status conference with counsel representing all parties to review the current status of the inquiry and to discuss how the inquiry would proceed to finality. Later that same day, I granted various defense motions to file de-

fense exhibits with the Special Master. (Prior to that time, all such motions had been filed with the Court and had been acted upon by the Judges of the Court; however, consistent with the Court's appointment of a Special Master to conduct evidentiary proceedings, I directed counsel to file all future motions relating to that inquiry with the Special Master rather than with the Court.)

At the August 6 status conference, there was concensus that, after the affidavits from the three witnesses could be examined, it might well be that no evidentiary hearing would be necessary. Thus, I ordered that, on or before August 10, all parties file a motion either to hold an evidentiary hearing or to proceed to resolution of the cases without one. Subsequently, all parties filed motions to proceed without a hearing.

In a telephone conference with counsel representing all parties on August 10, I indicated that I was inclined to grant these motions, except that there were two areas that I believed needed some further factual development. I suggested that if counsel could stipulate to the facts in these areas, a hearing likely would be unnecessary. Counsel stated that they believed such a stipulation could be reached.

Accordingly, by order dated August 13, 1990, I directed the parties: to stipulate, if they could, on the facts in the two areas of concern on or before August 27, 1990; to file with the Special Master any remaining documentary evidence that they thought relevant on or before August 27, 1990; and to file with the Special Master briefs and proposed findings of fact, conclusions of law, and recommendations to the Court on or before September 4, 1990. The parties complied in all respects.

Thereafter, this Report was written, is filed with the Court on the date indicated, and has been served on counsel for all parties on the same date.

## II. *Findings of Fact*

The following discussion constitutes my findings of fact based upon the three affidavits ordered by the Special Master and upon the remainder of the records of trial, including all documentary evidence filed with the Court or with me. The discussion is in two parts. First, from a big-picture view, I will discuss how the situation factually developed in which the decision of the U.S. Navy Court of Military Review in each of several hundred cases that were decided between 1977 and 1984 were not served on the accused and what was done, generically, after 1984 to accomplish such service. Then, I will discuss individually each of the fifteen cases that are before the Special Master to find in each instance the facts surrounding what was done to serve the subject appellant and surrounding any claim of prejudice by the subject appellant.

### A.

On May 2, 1977, the U.S. Court of Military Appeals announced its decision in *United States v. Larneard,* 3 MJ 76. There, the Court addressed whether a decision of the Court of Military Review had been "constructively" served on the accused when it had been sent to the address that the accused himself had given the military when he had gone on appellate leave after having served his sentence to confinement. The Government, urging that he had, offered two theories: First, that appellant's sister had acted as his agent when she had signed for the delivery of the decision; second, because appellant had omitted to advise his command of any change in his appellate-leave address, as he had agreed to do by signing a form to that effect, he had waived personal service.

A majority of the Court opined that the procedure was not unconstitutional and observed that it seemed entirely reasonable. However, it concluded that the only statutory basis for promulgating such a procedure was Article 67(a)'s grant of authority to this Court to devise its rules of procedure. Inasmuch as this Court had not published rules of constructive service that

would begin the time within which an accused must petition this Court for review, any constructive service was unlawful. Based on traditional notions of attorney/client agency, however, the Court did conclude that, if an accused had signed a power of attorney authorizing his defense counsel to accept such service in his stead, service on defense counsel met the statutory requirement that "he"—that is, the accused—be personally served.

On January 20, 1982, when the Military Justice Amendments of 1981 took effect, the *Larneard* decision was statutorily modified to provide for service of a CMR decision on an accused by mailing the decision to the accused by first-class mail. Thus, from May 2, 1977, through January 19, 1982, service of a CMR decision had to be accomplished either by serving it on the accused personally or, if the accused had signed a power of attorney specifically so authorizing, serving it on the accused's defense counsel.

Inexplicably, the Naval service never implemented a service-wide policy of requiring accuseds who are embarking on appellate leave to sign powers of attorney. While some Navy and Marine Corps commands utilized forms for this purpose, this was the exception rather than the rule. As the parties in these cases have stipulated, "There is no explanation for the absence of such [a Navy-wide] requirement, which would have eliminated the necessity for personal service on appellants."

During this period of time of nearly 4 years after publication of *Larneard,* the Administrative Officer of the Navy–Marine Corps Appellate Review Activity (NAMARA) was responsible for accomplishing service of CMR decisions on accuseds. The practice was to mail the decision in an accused's appeal to the accused at his last address: In the case of an accused still on duty, it was sent to his duty address; in the case of an accused on appellate leave, it generally was sent to his appellate-leave address. When this was unsuccessful for some reason, such as the accused changing his appellate-leave address without notifying his command, as he was required to do—the decision was returned to the Administrative Officer marked "undelivered" or "no forwarding address" or with some other such notation.

When such a decision was received back by the Administrative Officer, the case simply was put aside, with no further effort to locate the accused. As the parties herein have stipulated, "During the period 1977–1984, no active attempts were made to identify, locate, and personally notify accused whose convictions may not have been final after *United States v. Larneard* ... During that period, only a passive method of service was utilized. Whenever an accused presented himself or otherwise became known to authorities as a person upon whom personal service of his N.C.M.R. decision was necessary, he was then so served and his appeal continued in due course."

Sometime in 1984, some official in NAMARA discovered that, as a result of this "passive method of service," there were "several hundred old cases in which appellate review had not been completed due to ... no personal service on the accused of the decision of the NCMR ..." Badger Affidavit filed in USCMA in *United States v. Hock, supra* (Badger Aff. I). The Military Justice Division, Office of The Judge Advocate General of the Navy, was tasked with assisting the Administrative Officer— then Ms. Miriam Hevey—to identify these cases and to advise what legally must be done to finalize appellate review of them.

In August 1984, Lt.Col. Badger reported to the Military Justice Division. He immediately was advised of this situation by then-CDR Nicholas P. DeCarlo, Deputy Division Director. Badger was directed by CAPT Robert H. McLeran, Director of the Division, to assume responsibility for this effort—which became known as the "promulgation project" or "prom project"—in addition to his regular duties.

Between August 1984 and the spring of 1985, Badger reviewed applicable law and regulations and examined over 13,000 dock-

et entries of cases received by NAMARA between 1977 and 1982, as well as reviewed "a large number of records of trial ..." Badger Affidavit filed with the Special Master (Badger Aff. II). Specifically, Badger's examination of the docket entries reflected approximately 900 cases in which he was unable, at that point, to determine whether personal service had been accomplished. He ordered retrieval from storage of the records of trial in these cases and examined those records for any indication of personal service or of a power of attorney; he also looked for any "evidence of any attempts to serve the accused at every address reflected in his record of trial." Badger Aff. I. This review revealed that personal service *had* been accomplished in over 200 of the 900 cases, leaving a remainder of approximately 685 cases in the project.

This initial examination completed, Badger then briefed RADM Thomas E. Flynn, then-The Judge Advocate General of the Navy, in the spring 1985 on the nature and scope of the project and offered Flynn three options: (1) Set aside the findings and sentence and dismiss the charges; (2) continue the passive approach to serving an accused if and when he surfaced for some independent reason; or (3) undertake an active case-by-case review to investigate and determine each accused's current address and then to personally serve him. In connection with the latter option, Badger also advised Flynn "of the risk that making the effort to complete appellate review would raise a 'speedy review' issue which could potentially be resolved against the government and result in reversal of the convictions." Badger Aff. I. Nonetheless, Flynn ordered the latter route, to be undertaken by NAMARA with assistance of the Military Justice Division.

There was a good deal of uncertainty as to what, if anything, had been done to perfect service after the first, unsuccessful attempt in each case. Accordingly, a need was seen to develop some means of documenting what efforts would be made from that date forward, at least. In the summer of 1985, Capt. Gidari, USMC, recommended to Badger the use of a form case-summary sheet for each case that would permit entry of these efforts as they occurred. Badger approved this recommendation, and those sheets have been used to help document those efforts in each individual case before the Special Master.

As to the sources of the entries on these case summaries, Badger reveals: "Some entries were made contemporaneously with the event (usually telephone calls), some entries were transcribed from official or business records, and some entries were transcribed from previous summary sheets. Sources of information included records of trial, appellate leave orders, service records, records or correspondence of general court-martial convening authorities or other government agencies, telephone calls, and comments by reviewing officers." Badger Aff. II.

During the remainder of 1985 after his briefing of Flynn, Badger initiated three distinct efforts to find the 685 missing accuseds. First, during the summer, "active duty officers on vacation from law school" combed the records of trial for possible addresses and, where any were found, made telephone calls to persons at these addresses to determine whether the accuseds still were there; where this seemed hopeful, service documents were prepared and sent to the accuseds at those addresses. Second, attempts were made to find current addresses from other Federal agencies, like the Internal Revenue Service, Social Security Administration, etc.; these efforts largely were frustrated, however, by agency policies and laws preventing disclosure of such information. Third, Badger ordered service-record books of 25 randomly selected accuseds to be sent from the Federal Personnel Records Center in St. Louis, Missouri, in order to see if any new addresses could be found by this route; "[n]o new addresses were found, leading me to conclude that the service record books were not good sources of addresses not previously known." Badger Aff. I. By

the end of 1985, the number of outstanding cases as yet then-unserved on the accuseds had been reduced from 685 to approximately 415.

These measures having been exhausted, the effort to serve the remaining accused's in the prom project reverted to the passive approach during 1986 and 1987. For instance, some were served after being apprehended for desertion (although, as my subsequent discussion of the individual cases will demonstrate, such opportunity often was missed), and two accuseds were served when they sought medical attention at Naval hospitals. Some thought was given during this period to using recruiters to help serve missing accuseds personally, but this idea was rejected as being "totally inconsistent with their recruiting function." During this 2–year period, the rate of service plummetted to a meager "one every one to three months." Badger Aff. I.

In June 1987, Colonel Mitchell replaced then-Colonel Charles Cushman as Officer in Charge, NAMARA; and Badger briefed him on the prom project. This was the first that Mitchell had learned of the project. Mitchell "understood the then on-going plan was to try one more evolution to locate these accused and then hold the cases pending some future fortuitous action by an accused to determine the status of his case." However, Mitchell "was not satisfied with that objective. [He] considered a number of alternatives and preferred action to appropriately close and/or litigate these cases, leaving the ultimate judgement re the adequacy of service attempts to the courts." Mitchell Aff.

To this end, Mitchell offered a number of specific suggestions, such as using the National Crime Information Center (NCIC) computer files and utilizing the service's "drilling reserves." Essentially, however, Mitchell's role was to give the effort an identifiable sense of direction and purpose and to let his senior subordinates develop the means of accomplishing the objective; his basic guidance was to redo every case and to document all efforts made in each case to locate the accused.

As part of this new effort, the Navy Absentee Collection Unit of the Naval Personnel Command was contacted sometime early in 1988 and agreed to provide NAMARA with access to the NCIC computer files. Badger found an experienced operator for this task—a reserve judge advocate supporting the Military Justice Division—who devoted several weekends to entering the name, social security number, and date of birth for each of the over 400 still-missing accuseds.

Whenever the NCIC search produced "responsive information," the operator then "request[ed] criminal history information" on the subject. Badger Aff. II. About 150 of the 400 accuseds were listed in the NCIC files. Requests for addresses for those 150 were made to appropriate police and sheriff departments, yielding some addresses. When addresses did come back, the service packages were mailed to the accuseds at those addresses. About 20 accused were found and served in this manner.

Besides giving direction to the prom project soon after taking over at NAMARA, Mitchell also initiated efforts to restructure NAMARA "to set up and resource an administrative organization capable of properly and efficiently handling appellate administration, even though these cases were not entirely the reason for this action." Mitchell Aff. Pending this restructuring, responsibility for the prom project officially remained with NAMARA's Administrative Officer, assisted by OTJAG's Military Justice Division under CAPT McLeran. At the end of 1986, Ms. Hevey had retired as the Administrative Officer and had been replaced by then-LT(jg) Lester P. Bush. As a practical matter, though, Badger—in McLeran's office—continued to carry out the effort.

In August 1988, after the restructuring had been accomplished, Mitchell transferred responsibility for the project to NAMARA's new Administrative Support Division under CAPT DeCarlo, with then-Major

Crocker being the action officer responsible for carrying out the day-to-day effort as Head of the Case Management Branch. (As then-Maj. Crocker describes this new office in an affidavit submitted to this Court in *United States v. Hock, supra,* "In this position I am the official custodian of original records of trial submitted by Navy and Marine Corps commands for appellate review under the UCMJ. One of the duties I have is to serve the accused after the Navy–Marine Corps Court of Military Review ... issues its decision in the case." Crocker Aff. I.) At that time, approximately 390 accuseds still remained unlocated; in about 30 of these cases, service packages had been mailed to the accuseds, but no return had yet been received. *Id.;* Crocker Affidavit filed with the Special Master (Crocker Aff. II); Badger Aff. I.

Badger and Crocker met on two or three occasions during July and August in preparation for the reassignment of the prom project to Crocker. Badger advised Crocker on the scope of the project and what he had done thus far to accomplish service. Badger also briefed Crocker on the case-tracking system he had used during the project—a system "which was different from the system used to track all the other cases at NAMARA." Crocker Aff. II.

One of Crocker's first actions was to initiate application of the same case-tracking system to the prom project cases that was used for all other cases at NAMARA. Crocker assigned Ms. Pat Amunson, civilian supervisor of Promulgations, to enter the cases onto the computer case-tracking system: Amunson "was the most familiar with the old history of these cases and ... she knew *all* of the various entries that had to be made before we could begin tracking these cases like all the others." Crocker Aff. II (emphasis in original). These entries were completed for all cases by November/December 1988; at that time, Amunson returned the case-summary sheets to Crocker for her use. Crocker made all subsequent notations on the case-summary sheets either the same day as the

activity noted or, on some occasions when the event occurred on Friday, on Monday.

Through early-January 1989, Crocker followed up on Badger's leads, resulting in successful service in several cases; part of this follow-up was to recheck NCIC records of five accuseds whose case summaries indicated might well run afoul of the law and might appear if rechecked. Additionally, counsel in the Appellate Government Division screened the remaining cases to determine whether any could serve as "lead cases" that the Government could use in some unspecified manner to "resolve the project." Crocker Aff. II. Crocker avers: "As a result of this screening, approximately 130 cases were resolved because the appellants had either been restored to duty, had their convictions overturned at NCMR, or had been administratively separated with an honorable discharge." Crocker Aff. II.

Neither the affidavit nor any other evidence before the Special Master indicates exactly *how* a case was "resolved" when the accused either had been restored to duty or had been administratively separated with an honorable discharge; presumably, such an accused still would have an interest in having his conviction reviewed, so such an event would not, alone, serve to "resolve" the situation by mooting the need to serve the accused. It appears that by "resolved," Crocker believed that these occurrences rendered execution of the adjudged punitive discharge unnecessary, and so the cases could be finalized. *See Myers–Gathings, infra.*

Sometime about early-April 1989, Crocker initiated an effort of giving Appellate Government counsel lists of names and social security numbers "to forward to one of their reservists working at the Navy Pay Center in Cleveland to attempt to locate a current address." This effort ended in mid-May 1989, when Crocker "was informed that because of the reservist's work schedule, he would no longer be able to search for addresses." Crocker Aff. II. In any event, this effort had not been very

successful—producing only one or two positive results.

At that time, DeCarlo advised Crocker to "wait to see what USCMA would decide in" prom project cases then pending before the Court—cases in which the project had resulted in service on the accused and the accused then successfully had petitioned the Court for review. On June 16, 1989, the Court published its joint decisions in *United States v. Myers* and *United States v. Gathings*, 28 MJ 191, as of which date 227 accuseds in the project remained unserved.

In *Myers–Gathings*, the Court did what it had implied in *Larneard* was within its statutory authority: It set out "an acceptable form of constructive service for decisions of the Courts of Military Review" that would satisfy "military due process ... in the remaining open cases" which could be utilized to finalize those cases "after all other reasonable efforts were exhausted ..." *Id.* at 194.

Noting that "publication is a well-established method of notification," the Court specified what steps had to be followed to satisfy its edict. "First and most obvious is publication via a notice in a newspaper of general circulation in the community of appellant's home of record." "Next, a copy of the decision of the Court of Military Review, together with the appropriate forms for petitioning this Court should be placed in the official service records of the accused. Third, the announcement should be placed in the *Federal Register*. When the preceding steps have been taken, service of notice of the decision shall be deemed effective," and the case may be considered final for purposes of executing an adjudged discharge if appeal to the Court is not taken within the statutory period of 60 days. *Id.*

After reviewing this decision and discussing it with DeCarlo, Crocker set out to comply with it as a blueprint for resolving the remaining cases. She reviewed all 227 cases in which promulgation still had not occurred to determine whether the ac-cuseds were on appellate leave or erroneously had been given a punitive discharge or otherwise had been separated from the service—this factor would determine where the accuseds' service records were located. Having thus ascertained location of the records, Crocker began in July 1989 to follow the blueprint of *Myers–Gathings*.

For those accuseds on appellate leave, she telephoned the commands that still had the records to obtain any and all addresses in those records—addresses such as home-of-record, last-known address, next-of-kin addresses, etc. Promulgation packages were mailed to those addresses; additionally, packages were mailed to the commands for insertion in the service records. This mass-mailing effort began in July 1989.

For those accuseds who had been separated from the service, the service records were obtained from the Record Center in St. Louis—a cumbersome and time-consuming bureaucratic process that was not finally completed until October or November 1989—and were combed for any and all addresses. Promulgation packages were sent to all home-of-record addresses and to all new addresses not previously attempted; also, a promulgation package was inserted into each service record with instructions to give it to the accused if he ever requested a copy of his records at some future date.

Whenever a promulgation package was mailed to an address, it was sent by Certified Mail with a green Return Receipt card attached to the envelope; the receipt card was checked for "Restricted Delivery—Deliver to Addressee Only." When a receipt card was received back, it was examined to determine who had signed it. Whenever someone other than the accused or a known family member had signed the receipt card, the package was remailed with restrictive-delivery instructions printed on the envelope in one-inch letters; also, service records were combed for emergency-data cards or other documents that the accused might have filled out when entering the service to see if the signator was a relative. Then, relatives were contacted in

an effort to locate the accused. In seven cases when relatives were contacted, it was learned that the accused had died.

Of the 227 cases still unserved when *Myers–Gathings* was published, 83 were promulgated in this shotgun effort—a success rate of 36.56%.

Thus, after all efforts detailed above, 144 of the original 900–odd cases remain in which the accused has not been served with notice of the Court of Military Review decision. In each of these cases, notice of the decision, along with appropriate forms and instructions, has been placed in the accused's service-record book; and notice was published in the *Federal Register* on March 5, 1990, in all cases, as well. Accordingly, as of that date, two of the three prongs of constructive notice set out in *Myers–Gathings* have been met in these remaining 144 cases.

To date, however, there has *not* been notice published in the newspaper of general circulation in the accused's home of record in any of the remaining 144 cases, as *Myers–Gathings* required. Memoranda in the files of Lieutenant Brink, Crocker's successor as Head, Case Management Branch, NAMARA, indicate that, on March 20, 1990, Crocker wrote to DeCarlo and indicated that publication in *USA Today*—a nationally distributed newspaper—would cost approximately $20,000; she requested that DeCarlo seek the necessary funding. That same date, DeCarlo wrote Mitchell, recommending that the Navy "attempt to find the money or at least go on record asking for it." He indicated that publication in this particular newspaper would satisfy *Myers–Gathings* because it was circulated in every city and town in the continental United States. Moreover, because of its national circulation, an accused or his relatives who are *not* in the accused's former hometown are more likely to see the notice and take steps to contact the Navy. There is no evidence, however, that any additional steps have been taken toward publication in any newspaper.

Finally, three facts should be set out that apply to all 15 cases now before the Special Master, except where stated otherwise. First, initial service of the Court of Military Review decision on each accused failed because the accused either was in a deserter status, failed to claim his mail at the address supplied by him, or failed to provide forwarding addresses, as he was required to do and had agreed to do when he signed his appellate-leave form; in no instance was initial service intentionally withheld by the Naval service. Second, whenever a promulgation package was returned marked "unclaimed," the accused has offered no explanation why the package did not reach him; assuming regularity of postal business, I find that the explanation is that the accused failed, for whatever reason, to go to the Post Office and claim his mail per postal notice to do so. Finally, except where expressly stated otherwise in the factual discussion of each case, accuseds made no effort to obtain their military records and made no inquiry concerning the status of their cases or the status of their discharges.

## B.

1. *United States v. Hock*, No. 63,621. On May 19, 1977, Hock was convicted by special court-martial at 29 Palms, California, of AWOL, disobeying orders of a superior noncommissioned officer (3 specifications), and disobeying an order of a superior commissioned officer and was sentenced to a bad-conduct discharge, confinement for 60 days, and forfeiture of $245 pay per month for 2 months. The convening authority approved these results, but he suspended the BCD for 12 months. On his appellate-rights form—a form signed by an accused after trial on which he acknowledges being advised of his appellate rights and on which he elects or waives appellate representation—Hock furnished the same address in St. Louis, Missouri, as was his home-of-record address when entering the service.

On November 30, 1977, the Court of Military Review affirmed the findings and sen-

tence. Since there was no power of attorney in the record authorizing service on defense counsel, the promulgation package (decision of the Court of Military Review, form for petitioning the U.S. Court of Military Appeals, and necessary instructions) was sent to 29 Palms, his military address. When a legal administration officer attempted to serve the package on Hock on December 7, 1977, he was unable to do so because Hock then was an unauthorized absentee.

Hock was arrested in St. Louis for desertion on March 22, 1978, and was returned to 29 Palms 9 days later. On May 12, an order was issued vacating the suspension of the bad-conduct discharge due to his unauthorized absence, although no record of a vacation proceeding is in the record of trial or has been produced from any other source. Thereafter, Hock erroneously was issued a DD Form 214, his punitive discharge, on May 17, 1978, and he was given a copy of it on that date at 29 Palms. At no time during these 2 months during which Hock was in military control at his former installation, 29 Palms, was any effort made to serve him with the Court of Military Review decision.

The Government made no effort at all to locate and serve Hock during the next 10 years. The first such effort was on May 7, 1988, when NCIC record were checked that showed his only arrest was the one for desertion in 1978. On May 20, Badger attempted to obtain Hock's address from the FBI in St. Louis but was advised that any such request must be made from FBI headquarters. Without explanation, this was not pursued further.

After publication of *Myers–Gathings*, Crocker obtained Hock's service-record book, and a promulgation package was sent on October 19, 1989, to his home-of-record address in St. Louis—the same address that Hock had provided on his appellate-rights form after trial. Additionally, a package was inserted in Hock's service-record book on October 25. Hock received

the mailed package on October 30 and timely petitioned this Court for review.

2. *United States v. Everhart*, No. 63,-543. On September 5, 1980, a special court-martial in San Diego convicted Everhart of absences without leave (2 specifications) and sentenced him to a bad-conduct discharge and confinement for 30 days. The convening authority approved these results. Inasmuch as Everhart had waived appellate representation, no address was provided by Everhart in his appellate rights form.

The Court of Military Review received the record on January 30, 1981, and affirmed the findings and sentence on March 30, 1981. Since no power of attorney authorizing service of counsel appeared in the record, the promulgation package was sent to Everhart's former command, the USS ELLIOT, to attempt service on him at his last known address in Pacific Beach, California—the address that Everhart had given as his appellate-leave address. Such service was attempted in June 1981, but the package was returned "unclaimed." The command made no further effort to locate Everhart, such as searching his service-record book for other addresses. Instead, on September 11, 1981, the USS ELLIOT returned the package to OTJAG.

Nothing further was done to locate Everhart until May 8, 1988, when Badger conducted an NCIC check and learned of a long criminal history in California and Colorado from 1981 through 1987 and learned, also, of an address in Colorado Springs that was on an arrest report in that city dated March 12, 1987: 4275 Marlow Circle. On July 21, service was attempted at that address, but the envelope was misaddressed to 4725 Marlow Circle; as a result, it was returned "no such number" on July 29. A year later, on August 15, 1989, service was attempted at the correct address, but it was returned "unclaimed" on September 14.

Coincidentally, about the same time that Badger was conducting the NCIC check—May 25, 1988—Everhart wrote to ask for a copy of his service-record book. The

record was sent to him at the address he then provided: 5147 Eros Way, Colorado Springs, Colorado 80917. For some reason, though, Badger and others working on the prom project did not learn of this communication.

After the *Myers–Gathings* decisions, Crocker obtained Everhart's service-record book, and on September 8, 1989, she attempted service at several addresses found in that book. One of those addresses was the same one Everhart had used when requesting his DD Form 214 over a year earlier. Everhart received his package at that address on September 15, 1989, and petitioned this Court for review on October 7.

3. *United States v. Malaterre*, No. 63,-549. A special court-martial at Camp Pendleton, California, convicted Malaterre on May 3, 1977, on specifications alleging a 3–day AWOL, damaging military property (2 specifications), and reckless driving. The court sentenced him to a bad-conduct discharge, confinement for 60 days, and forfeiture of $100 pay per month for 4 months. The convening authority reduced the period of confinement to 30 days but otherwise approved these results.

Malaterre did elect appellate representation but provided no address on his appellate-rights form. He was placed on appellate leave on October 5, 1977, and provided an address in Everett, Washington, at that time.

On February 14, 1978, the Court of Military Review affirmed the findings and sentence. Since the record contained no power of attorney authorizing receipt of service by defense counsel, Malaterre's former command sent his promulgation package to his appellate-leave address in Washington on February 24. However, it was returned unclaimed. Less than 2 months later—May 16, 1978—Malaterre erroneously was issued a DD Form 214, his punitive discharge, but no copy was sent to him because he was unavailable.

Until May 1988, no further effort was made to locate Malaterre to serve him with the promulgation package. On that date, Badger ordered an NCIC check that yielded a record of arrests in Montana, Washington, Nevada, and Arizona between 1978 and 1982, but no addresses. Calls were made to an Arizona sheriff's office and the Arizona Department of Transportation (re: a driver's license) in an effort to obtain a recent address, but to no avail.

After *Myers–Gathings* was announced, Crocker ordered Malaterre's service-record book, and in October 1989 she sent promulgation packages to his home of record in Belcourt, North Dakota—the same address that Malaterre had listed on his enlistment into the Marine Corps. Malaterre received that package and petitioned this Court for review on October 26, 1989.

4. *United States v. Benge*, No. 63,817. A special court-martial at Camp Pendleton, California, convicted Benge in January 1978 of unauthorized absence and sentenced him to a bad-conduct discharge, confinement for 3 months, forfeiture of $265 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results.

The Court of Military Review received the record on October 24, 1978. The record does not contain an appellate-rights form, but Benge was appointed counsel. On December 13, 1978, the court affirmed the findings and sentence.

Since the record contained no power of attorney, Benge's command attempted to serve him with the promulgation package on January 17, 1979; however it was unsuccessful because he then was absent without leave.

On April 26, 1981, Benge returned to military control from his unauthorized absence; subsequently, he was returned to the same unit from which he had absented himself—and the same unit that had tried to serve him unsuccessfully 2 years earlier. He was administratively discharged in lieu of court-martial for this unauthorized absence on July 1 (under conditions other than honorable), and he was issued a DD

Form 214 on that date. During this 2–month period in which Benge was in military control, in his former unit, no attempt was made to serve him the promulgation package from his previous court-martial.

Nothing further was done in this regard until May 1988, when Badger performed an NCIC check; however, that effort was fruitless concerning any criminal history or address.

Following *Myers–Gathings*, Crocker obtained Benge's service-record book, and in November 1989 she sent promulgation packages to two addresses, one of which was his home of record in Muldrow, Oklahoma—the same address Benge had given when he had enlisted in the Marine Corps in 1976. Benge received his package there and petitioned this Court for review on December 4, 1989.

5. *United States v. Greer*, No. 64,028. A special court-martial at Norfolk, Virginia, convicted Greer on December 20, 1977, of two AWOLs and one missing movement through neglect and sentenced him to a bad-conduct discharge, confinement for 76 days, forfeiture of $250 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results.

Greer elected appellate representation, and his appellate-rights form gives an address in Fisherville, Kentucky, that is the same address as was his home of record.

On October 3, 1978, the Court of Military Review affirmed the findings and sentence, and the court denied a motion for reconsideration 2 weeks later. Since the record contained no power of attorney, Greer's former command tried to serve him with his promulgation package by mailing it to the Fisherville, Kentucky, address in November 1978. However, it was returned "unclaimed" the next month. The command renewed this effort by mail to this same address in September 1979, but that package, too, was returned unclaimed the following month.

Notwithstanding the return of both mailings, Greer asserts that he lived at the Fisherville address from the time he left the service until the house at that address burned down in 1982. He offered no explanation, however, as to why he did not claim either package. Moreover, other records reflect arrests in Louisville and Frankfort, Kentucky, in 1978 and 1979 and that he spent a year in prison in 1979, so his assertion of continuous residence in Fisherville until 1982 is not credible.

In December 1979, Greer erroneously was issued a DD Form 214, his punitive discharge. He was unavailable to sign for it, but a copy was mailed to him in Fisherville.

Nothing further was done to locate Greer for service until 1988, when Badger ordered an NCIC check, but that effort was unsuccessful because the wrong social security number unknowingly was entered into the computer. Then, on April 18, 1989, Greer was sent a promulgation package to an address in Louisville, Kentucky, that had been furnished by the Appellate Government Division. This package was returned, though, with a forwarding address on the envelope. On May 5, 1989, a package was sent to the forwarding address, but it was returned, also, marked "moved—left no address."

Following *Myers–Gathings*, Crocker obtained Greer's service-record book and, in December 1989, mailed packages to several addresses found therein, including an address in Eastwood, Kentucky, that was found on a Request Pertaining to Military Records executed by Greer in 1983. Although Greer asserts that he has lived at that address continuously since 1982, a Request Pertaining to Military Records (asking for a DD Form 214 and medical and dental records and asserting that the purpose of the request is to "appeal for discharge upgrade"), executed by Greer on February 26, 1987, contains an address in Jeffersontown, Kentucky. Accordingly, this assertion by Greer, like the one earlier noted regarding his purported continuous

residency in Fisherville until 1982, is not credible.

In any event, the package mailed to Eastwood was received, and Greer petitioned this Court for review on December 26, 1989.

6. *United States v. Madden*, No. 63,591. A special court-martial at Parris Island, South Carolina, convicted Madden on March 7, 1977, of two unauthorized absences and sentenced him to a bad-conduct discharge and reduction to the lowest enlisted grade. The convening authority approved these results. Madden waived appellate representation, but the appellate-rights form nonetheless contained an address in Merian, Pennsylvania.

On June 14, 1977, the Court of Military Review affirmed the findings and sentence. Since no power of attorney was in the record, the promulgation package was sent to Madden's command for service at his military address on July 25, 1977. However, this was not possible because Madden then was an unauthorized absentee.

Madden was arrested by the FBI as a deserter on October 27, 1977, in Merian, Pennsylvania, and was returned to military control. He remained in military control until November 23, 1977, when he was released from confinement and erroneously issued a DD Form 214, his punitive discharge. No attempt was made to serve Madden with his promulgation package during that one-month period.

In May 1988, Badger ordered an NCIC check on Madden, but it revealed no criminal record or any address.

Following *Myers–Gathings*, Crocker obtained Madden's service-record book; and in October 1989, she sent promulgation packages to Madden's home of record as found on his enlistment form—one to a specific address in Bala–Cynwyd, Pennsylvania, and one to General Delivery in that town. Madden received one of these packages through his mother on October 23 and petitioned this Court for review on November 2; his petition form gives still a different address, one in Princeton, New Jersey.

7. *United States v. Reyna*, No. 63,813. On May 20, 1977, a special court-martial at Camp Pendleton, California, convicted Reyna of six unauthorized absences and escape from confinement; the court sentenced him to a bad-conduct discharge, confinement for 45 days, and forfeiture of $240 pay per month for 2 months. The convening authority approved these results, except he suspended the BCD for 6 months. Reyna elected appellate counsel but provided no address on his appellate-rights form. The Court of Military Review received the record on February 14, 1978—nearly 9 months after the court-martial.

In the meantime, Reyna was released from confinement after serving his sentence—and immediately absented himself without authority once again. He was apprehended and tried again by court-martial; no punitive discharge was adjudged this time, but Reyna was discharged administratively and was issued a DD Form 214 reflecting this discharge under other than honorable conditions on February 16, 1978.

The Court of Military Review affirmed the findings and sentence in his first court-martial on April 26, 1978. The record contained no power of attorney, so Reyna's former command attempted to serve him with the promulgation package on June 23, 1978, at an address in Oceanside, California. It cannot be established how this address was obtained. In any event, the package was returned "unclaimed".

No further effort was made to find Reyna—including any NCIC check—until after *Myers–Gathings*, when Crocker obtained his service-record book. In October 1989, Crocker sent packages to three addresses in Beeville, Texas; one was to Reyna's home of record on his enlistment papers, one was to a street that Reyna had listed on his DD Form 214, and one is of unknown origin. Reyna signed for all three packages on November 3 and petitioned this Court for review on December 4, 1989; his petition form reflects the address of unknown origin.

8. *United States v. Street*, No. 63,897. A special court-martial at Seattle, Washington, convicted Street in absentia in June 1978 on 2 specifications of AWOL and sentenced him to a bad-conduct discharge, confinement for 45 days, forfeiture of $150 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results. Defense counsel elected appellate representation on Street's behalf, but, of course, no leave address was provided on the appellate-rights form.

The Court of Military Review affirmed the findings and sentence on November 15, 1978. There was no power of attorney in the record, so Street's command tried to serve him on December 8; that effort was unsuccessful, however, due to Street's continuing unauthorized absence.

On February 19, 1983, Street was apprehended and turned over to the military in Seattle on February 25. Although the parties contend that Street was placed in *pretrial* confinement on that date, a form entitled "Record of Unauthorized Absence" in the appellate papers in this Court reflects the following partial entry (emphasis added): "Received on board Naval Station Seattle, WA at 1500, 83Feb25. Retained on board pending disciplinary action. *Placed in confinement at Naval Station Brig, Seattle, WA on 23Feb25 to serve confinement awarded by a special court-martial convened by Naval Support Activity on 78Jun21 (member was tried in absentia at Seattle, WA).* Awarded confinement at hard labor for period of 45 days; forfeiture of pay $150.00 per month for three months; RIR to E–1 and a BCD *for previous charges.*"

Accordingly, the Navy not only knew of Street's prior court-martial and his prior-adjudged bad-conduct discharge, but it also caused him to serve the adjudged confinement from that court-martial when it apprehended him in February 1983.

Street was released from this confinement on April 1, 1983, and was restored to

duty status and "retained on board pending further disposition."

On May 2, he was tried for this most recent absence. He was convicted and sentenced to another bad-conduct discharge, confinement for 5 months, forfeiture of $375 pay per month for 5 months, and reduction to the lowest enlisted grade. The confinement was mitigated to 15 days' restriction and extra duty, after which, on May 20, he was placed on appellate leave; he provided a leave address in Lake Oswego, Oregon. Street was served with his promulgation package for this most recent court-martial on August 24, 1983, at his appellate-leave address, and subsequently the punitive discharge from that second court-martial was executed on October 24, 1983. Street signed his DD Form 214 and was given a copy of it.

At no time during the 8 months during which he was in military control—including time spent in confinement serving his first court-martial sentence—or at his appellate leave address following his second court-martial did anyone attempt to serve him with the promulgation package from his first court-martial.

On February 1, 1988, Street wrote the Records Center in St. Louis asking that a copy of his records be sent to the Clackamas County Community Corrections in Oregon, City, Oregon. The information was provided to the corrections office on March 15, indicating Street's second special court-martial conviction and the BCD that was executed on October 24, 1983. No effort was made at that time to serve Street with the promulgation package from his first court-martial.

Finally, in May 1988, Badger ordered an NCIC check on Street, which reflected several arrests in the previous year—the last one less than 2 months earlier—in South Oregon City, Oregon, a community very nearby Lake Oswego. The sheriff's office in that city was contacted, and an address in Wilsonville, Oregon, was obtained. A promulgation package was sent to that address, but neither the package nor the receipt card was received back.

A year later, in July 1989, a package was sent again to that same address. This time the package was returned, marked "moved left no address." Notwithstanding this notation, an address in West Linn, Oregon, was provided by the post office. When service was attempted by mail to that address, though, the package was returned again, marked "moved left no address."

After *Myers–Gathings*, Crocker obtained Street's service-record book and, in December 1989, mailed a package to the Lake Oswego, Oregon, address that Street had provided as an appellate-leave address in 1983; that same address also was Street's home-of-record address when he entered the Navy in 1972. This time, Street received the package at that address through an agent there and petitioned this Court for review on December 29, 1989.

9. *United States v. Campbell*, No. 63,242. Campbell was tried by special court-martial at San Diego on March 3, 1977, and was convicted of 3 unauthorized absences. He was sentenced to a bad-conduct discharge, confinement for 75 days, forfeiture of $100 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results. Campbell elected appellate representation and specified an address in Tuttle, Oklahoma, on his appellate-rights form.

The Court of Military Review affirmed the findings and sentence on September 14, 1977. Since there was no power of attorney in the record, the promulgation package was sent to Campbell's command in San Diego for service. On October 5, 1977, the command mailed that package to an address in Brawley, California. No document authoritatively establishes the source for this address; however, the Badger/Crocker case-summary sheet contains a notation that reflects that it was the address that Campbell had furnished as his appellate-leave address. No attempt at all was made to serve Campbell with the package at the Tuttle, Oklahoma, address provided on his appellate-rights form.

Campbell's bad-conduct discharge was ordered executed on November 7, 1977—erroneously. He signed the DD Form 214 and received a copy when it was promulgated on November 14. On the DD Form 214, Campbell listed the Brawley, California, address as the place he could be reached after separation; and he listed his home-of-record at enlistment as an address in Gore, Oklahoma.

No further effort was made to serve Campbell until May 1988, when Badger ordered an NCIC check. The report indicated no criminal record and no address. After *Myers–Gathings*, Crocker obtained Campbell's service-record book and sent him a promulgation package at his home-of-record address in Gore, Oklahoma, on August 21, 1989. Campbell received that package and petitioned this Court on September 6, 1989.

10. *United States v. Cousinard*, No. 63,270. Cousinard was convicted by special court-martial at Norfolk, Virginia, on January 16, 1979, of 2 unauthorized absences and disobedience of a commissioned officer's order. He was sentenced to a bad-conduct discharge, confinement for 3 months, and forfeiture of $275 pay per month for 3 months. The convening authority approved these results. Cousinard elected appellate representation and provided an address in Gary, Indiana, on his appellate-rights form.

The Court of Military Review affirmed the findings and sentence on January 23, 1980. In the absence of a power of attorney in the record, the promulgation package was sent to his former command for service. On February 7, 1980, the command sent the package to his last known address in Gary, Indiana—the same address that Cousinard had provided on his appellate-rights statement and the same address that appears as his home of record on his enlistment papers. However, it was returned "unknown".

Cousinard erroneously was issued a DD Form 214 on April 1, 1980.

No further efforts were made to serve Cousinard until May 1988, when Badger

ordered an NCIC check, which yielded no fruitful results. After *Myers–Gathings,* Crocker ordered Cousinard's service-record book; on August 30, 1989, she sent promulgation packages to his home-of-record address—this same address in Gary, Indiana—and to General Delivery in Gary. Cousinard received a package and petitioned this Court for review on September 7, 1989. The address on his petition is the same Gary, Indiana, address that has popped up all along.

11. *United States v. Hannah,* No. 63,-280. On September 20, 1978, Hannah was convicted by special court-martial at Norfolk, Virginia, for unauthorized absence and breaking restriction. He received a bad-conduct discharge, confinement for 2 months, forfeiture of $175 pay per month for 2 months, and reduction to the lowest enlisted grade. The convening authority approved these results. Hannah elected appellate representation and provided a Chicago, Illinois, address on his appellate-rights form; this is the same address Hannah had provided on his Record of Emergency Data that he had completed on February 25, 1977.

The Court of Military Review affirmed on March 21, 1979. In the absence of a power of attorney in the record, the promulgation package was sent to Hannah's former command for service. On May 1, 1979, the command sent the package to the Chicago address Hannah had provided, but it was returned "unclaimed".

On September 29, 1983, Hannah erroneously was issued a DD Form 214. He was unavailable at the time to receive a copy of the form, but the form listed the same Chicago address as the place where he could be located after separation.

No further effort was made to serve Hannah until May 1988, when Badger ordered an NCIC check; that check, though provided no useful information. Following *Myers–Gathings,* Crocker ordered Hannah's service-record book. In September 1989, promulgation packages were mailed to Hannah's home of record, the Chicago address he had provided on his appellate-rights form, and to General Delivery in Chicago. Hannah received the package and petitioned this Court on September 5, 1989. The address on his petition is the same Chicago address he had provided on his appellate-rights form.

12. *United States v. Henriksen,* No. 63,364. Henricksen was convicted by special court-martial in Norfolk, Virginia, on June 14, 1977, for 6 cocaine offenses. He was sentenced to a bad-conduct discharge, confinement for 3 months, forfeiture of $249 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results. Henricksen elected appellate representation and provided an address in Harlan, Iowa, on his appellate-rights form; it is the same address that uniformly appears on Henricksen's service documents as his home-of-record address.

On August 29, 1978, the Court of Military Review affirmed the findings and sentence. Since no power of attorney appeared in the record, the promulgation package was sent to Henricksen's former command for service. On October 2, 1978, the command sent the package to the Harlan, Iowa, address; it was forward to a post-office box in Kirkman, Iowa; but then it was returned marked "box closed".

On February 28, 1979, Henricksen erroneously was issued a DD Form 214; he signed and received a copy of it. The form listed the same Harlan, Iowa, address as the place where he could be located after separation.

No further effort was made to locate Henricksen until May 1988, when Badger ordered an NCIC check that ultimately proved fruitless. After *Myers–Gathings,* Crocker ordered Henricksen's service-record book; and in August 1989, she sent promulgation packages to the Harlan, Iowa, address and to General Delivery in Harlan. Henricksen received the package sent to his address, and on September 18, 1989, he petitioned this Court for review; the petition contains this same address.

13. *United States v. LeCroy*, No. 63,-212. LeCroy was convicted by special court-martial at Orlando, Florida, on November 6, 1979, of 4 unauthorized absences and breaking restriction. He was sentenced to a bad-conduct discharge, confinement for 4 months, forfeiture of $250 pay per month for 2 months, and reduction to the lowest enlisted grade. The convening authority approved these results. LeCroy elected appellate representation, but no address appears on the appellate-rights form.

The Court of Military Review affirmed the findings and sentence on December 12, 1980. Inasmuch as the record contained no power of attorney, the promulgation package was sent to LeCroy's former command for service. On January 21, 1981, the command sent the package to the address in North Miami, Florida, that LeCroy had provided as his appellate-leave address—the same address that was LeCroy's home of record in his service documents; but it was returned "unclaimed".

Nothing further was done to locate LeCroy until May 1985, when Badger unsuccessfully attempted to find him through telephone listings in Orlando, Florida—a place where LeCroy, in the record of trial, had indicated a desire to marry and settle. No listings were checked for any other city, including North Miami.

In May 1988, Badger ordered an NCIC check, the reliability of the results of which are in dispute between the parties. LeCroy's social security number was entered into the computer as 263–45–351$\underline{5}$. The printout was for a person with that social security number, but named Thomas A. Brownell, Jr., who has a history of criminal activity in Florida and Georgia between 1980 and 1987. It reports that his birth date was September 9, 1958, but that he has used two other birth dates: September 4, 1958, and September 9, 1951. The report also indicated that the subject has used a total of 9 aliases or nicknames, all variations of Thomas Anthony Brownell. The subject's vital statistics also are reported,

as is the fact that he has several identifying scars and tatoos.

LeCroy claims that his social security number actually is 263–45–351$\underline{3}$, and that the report is for someone else entirely. He points out that his birth date is November 17, 1958—a date that is different from Brownell's actual birth date and from any other birth date that Brownell is reported to have used. Neither party has offered any evidence concerning LeCroy's vital statistics, scars, or tatoos for comparison to the report of Brownell's.

The documents available to the Special Master are contradictory. Most of the court-martial documents reflect the number ending in "15". However, several other documents contain the number ending in "13": a form from the disciplinary officer at LeCroy's command to the military magistrate asking for LeCroy's confinement (Appellate Exhibit II); a form recommending accelerated grade advancement signed in March 1979 (Defense Exhibit B); and three Records of Unauthorized Absence (Prosecution Exhibits 1, 2, and 3). Moreover, the case-summary sheet maintained by Badger and Crocker reflects the following entry in response to the NCIC check (emphasis in original): "Probably *not* LeCroy. Check SRB for HT/WT." Although this record indicates the government's own doubts as to the reliability of the NCIC printout for Brownell and indicates, as well, the government's intent to check LeCroy's service-record book to verify his vital statistics, the government has not offered the Special Master any evidence in that regard.

Accordingly, I am unconvinced that the NCIC report was for LeCroy. First, none of the aliases used by the subject ever deviated substantially from his reported given name of Thomas A. Brownell—a name totally unlike Jon Michele LeCroy. Second, LeCroy's birth date is dissimilar from the subject's actual birth date and from any others he has used. Third, although several of the documents relating to LeCroy's court-martial contain the social security number ending in 15, several oth-

ers—including prosecution exhibits, a defense exhibit that is a form that is totally unrelated to the court-martial, and an appellate exhibit—reflect the number ending in 13. Finally, the Badger/Crocker case-summary sheet itself indicates doubt about whether the subject of the report is LeCroy and indicates an intent to check the subject's vital statistics against those in LeCroy's service-record book; yet, the government has offered no evidence to the Special Master that would tend to link the subject and LeCroy in this regard.

On July 8, 1988, the government proceeded on the assumption that the subject of the NCIC report was, indeed, LeCroy and mailed a promulgation package to an address in Westville, Florida, found in the report. It came back marked "refused—no such person at this address"—an additional factor supporting my finding that the subject of the report was not LeCroy.

Following *Myers–Gathings*, Crocker obtained LeCroy's service-record book and mailed a promulgation package to his home-of-record/appellate-leave address in August 1989. LeCroy received this package and petitioned this Court on August 27, 1989; his petition contains the same North Miami address as his current address.

14. *United States v. Torres*, No. 63,223. Torres was convicted by a special court-martial at Camp Pendleton, California, in June 1976 on charges alleging unauthorized absence, larceny (2 specifications), attempted sale of military property, sale of military property, and communicating a threat. Torres was sentenced to a bad-conduct discharge, confinement for 155 days, and forfeiture of $240 pay per month for 5 months. The convening authority reduced the confinement to 45 days but otherwise approved these results. Torres elected appellate representation, and he provided a New York address on his appellate-rights form.

On February 10, 1977—even before the Court of Military Review had acted—Torres erroneously was issued a DD Form 214 reflecting his punitive discharge. However, he did not sign or receive a copy of the document and never was aware that he formally had been discharged.

The Court of Military Review affirmed the findings and sentence on June 15, 1977. In the absence of a power of attorney in the record, the promulgation package was sent on July 21, 1977, to an address in Freeport, Long Island, New York, that Torres had provided as his appellate-leave address (this address is different from the New York address he earlier had listed on his appellate-rights form); the package was returned, however, marked "no longer at this address." A subsequent attempt to mail the package to the same address in July 1978 also was unsuccessful.

The house at the address in Freeport given by Torres is a house that he owns and periodically rents out. For the first year and a half after his court-martial, Torres lived part of the time in that house and part of the time with his mother in Carol City (Miami), Florida. The Florida address appears repeatedly in Torres' service-record book, beginning with his enlistment papers; notwithstanding, the government never made any attempt to serve Torres at the Florida address.

Nothing further was done to locate Torres for several years. The next indication of any activity in this regard is an entry on the Badger/Crocker case-summary sheet dated March 25, 1987, that Torres "appears to be incarcerated w/Fla Dept of Corr ... Custody # 180471." The sheet does not reflect what, if anything, was done with this information, however, until an entry made 14 months later, on May 20, 1988, states that Torres had escaped from the Florida jail, had been recaptured in Georgia, and still was in that state. Further notes made on that date indicate that Florida has no information on Torres' Georgia location.

On August 16, 1989—nearly 15 months later still—another NCIC check was run on Torres, and the printout reported that he was in a Georgia prison for murder. The Government contacted the Georgia Depart-

ment of Corrections and obtained Torres' prison address and inmate number.

Crocker mailed a promulgation package to Torres at his prison address on August 21, 1989. Torres received that package and petitioned this Court for review on August 28, 1989.

Torres states in an affidavit before the Special Master that between 1978 and 1980 he worked at the Florida State Prison as a Corrections Officer; twice during that time, a higher-paying "position for Lieutenant" was available, for which he was not considered because he could not provide proof of discharge from the Marine Corps. Also, Torres states that sometime in 1981, he was denied a job with the U.S. Postal Service (he had received "Postal training" at Fort Benjamin Harrison, Indiana, while in the military) because he was unable to provide copies of his military records.

Notwithstanding these claims, Torres has offered no corroboration of them. Moreover, Torres has offered no evidence that he would have been given either position—or that he even would have been considered for either position—if he had provided either employer with military records that reflected a bad-conduct discharge adjudged at a special court-martial. Indeed, he has not offered evidence that he even had disclosed this fact to either potential employer.

Moreover, I find it unlikely that he would have been offered either employment position—regardless of his military records—in light of his then-lengthy criminal arrest record that included interfering with police and resisting arrest (August 11, 1977); corruption by threat, possession of narcotic equipment, contributing to the delinquency of a minor, and unauthorized use and possession of a driver's license (November 28, 1979); grand larceny (November 15, 1980); aggravated assault with a motor vehicle (December 28, 1980); possession of stolen property as a first-degree felony (March 30, 1981); and loitering and prowling (September 27, 1981). His subsequent record of criminal activity is even more extensive.

Accordingly, I find incredible Torres' implications that he would have been offered either a promotion with the Florida Department of Corrections in the 1978–1980 timeframe or a position with the U.S. Postal Service in 1981 if he had been able to provide either employer with a copy of his service records that would have reflected his military court-martial and punitive discharge. This finding is buttressed by my inference that Torres, himself, recognized this, as reflected by the absence of any evidence that he ever tried to obtain these records so that he could secure either employment position.

15. *United States v. White*, No. 63,535. A special court-martial at Jacksonville, Florida, convicted White on April 20, 1981, of an unauthorized absence and sentenced him to a bad-conduct discharge, confinement for 3 months, and forfeiture of $200 pay per month for 3 months. The convening authority approved these results. White elected appellate representation and provided an address in Baxley, Georgia, on his appellate-rights form—the same address that was his appellate-leave address and his home-of-record address.

On November 30, 1981, the Court of Military Review affirmed the findings and sentence. There was no power of attorney in the record, so the promulgation package was mailed to White at his Baxley, Georgia, address on December 19, 1981; the package was returned "unclaimed".

No further efforts were made to locate White until May 5, 1988, when Badger ordered an NCIC check. The report indicated that White had a criminal-history file on record with the FBI and South Carolina but offered no specifics and no address. Badger did not follow up with either the FBI or South Carolina to see if further helpful information might be available.

After *Myers–Gathings*, Crocker obtained White's service-record book; and on August 1, 1989, she sent promulgation packages to the Baxley, Georgia, address and to General Delivery in Baxley. White received both packages through a "Mrs. L. E. White" on August 11 and petitioned this

Court for review on October 20, 1989; his petition reflects the same Baxley, Georgia, address.

On March 5, 1990, Crocker talked with Badger to inquire why he had not followed up the NCIC check 2 years earlier by contacting South Carolina authorities. He offered no reason except to say that probably it was because he was in the process of turning the project over to Crocker. Then, Crocker ordered a new NCIC report on that date in an effort to learn White's whereabouts between 1982 and 1989; the report reflects a short, unnoteworthy history of arrests in South Carolina and Georgia in 1986 and 1988.

In a letter that accompanied his petition to this Court, White contends that the delay in his discharge has precluded him from several job opportunities. He states that 4 years ago he was told by the Georgia Power Nuclear Plant that he "couldn't be hired without a clear discharge" and that at some unspecified time he ran into similar difficulties when pursuing a job with a construction company at Reidsville state prison. Further, he submits that, in many other situations, he did not even bother filling out an application after an employer had told him that he needed his discharge before he could be hired.

Notwithstanding, White has offered no supporting documentation of these alleged lost opportunities. Moreover, even his claim, itself, does not submit that he would have been favorably considered for the openings, either on the merits of his qualifications or in light of his military court-martial and punitive discharge. Finally, the record reflects no instance in which White affirmatively took any action to seek military records that would meet a potential employer's needs; in fact, I infer from his letter itself—and I so find—that he did nothing to overcome the claimed barriers to his employment except to seek other employment where his military records were not required.

III. *Conclusions of Law*

Based on the foregoing findings of fact, I reach the following conclusions of law, both generically as to the situation—its development and its resolution—and, where indicated, as to the 15 cases referred to the Special Master.

1. In light of the decision in *United States v. Larneard, supra,* the Naval service acted unreasonably in failing to adopt and pursue a service-wide policy of seeking each convicted accused's voluntary agreement to execute a power of attorney authorizing the accused's appellate defense counsel to accept service on the accused's behalf and to pursue the accused's appeal to the U.S. Court of Military Appeals if the accused subsequently was not personally available for service of the decision of the Court of Military Review.

2. The Naval service acted reasonably in attempting service on each accused at the accused's military address where the accused was not on appellate leave.

3. The Naval service acted reasonably in attempting service on each accused who was on appellate leave by mailing the promulgation package to the address given by the accused on the appellate-rights form or as his appellate-leave address.

4. Inasmuch as an adjudged punitive discharge cannot be executed until the court-martial conviction is final, which itself requires exhaustion of appellate review, *see* Art. 71(c), Uniform Code of Military Justice, 10 U.S.C. § 871(c); and in light of the decision in *United States v. Larneard, supra,* that no constructive-service alternative was available and that this Court would "not refuse a member the right to file a petition for grant of review where he can show that he acted within 60 days ... of the date he received *actual notice,*" *United States v. Myers, supra* at 195 (emphasis added), citing *Larneard,* the Naval service acted unreasonably when it made no active effort for several years to locate accuseds who were not amenable to service as described above. It was especially unreasonable to fail to attempt service at an accused's home-of-record ad-

dress—at this point in time when the accused's service-record book was readily available—promptly after return of a promulgation package from an appellate-leave address or an address listed on an appellate-rights form.

5. The Naval service acted reasonably when, in 1984, it decided that additional effort must be undertaken to locate the several hundred accuseds who remained unserved with their Court of Military Review decisions rendered between 1977 and 1982.

6. Lt.Col. Badger acted reasonably in his efforts during 1984 and 1985 to determine the precise scope of this situation and thereby identify 685 such accuseds, whose punitive discharges had not lawfully been executed because they remained unserved with their Court of Military Review decisions.

7. RADM Thomas E. Flynn, then-The Judge Advocate General of the Navy, acted reasonably when, in the spring of 1985, he ordered that an active effort be undertaken on a case-by-case basis to locate such accuseds and to serve them.

8. During 1985, Badger acted reasonably in conducting the active effort ordered by Flynn.

9. In light of the legal conclusions set out in paragraph 4 above, Badger acted unreasonably when he decided not to order the service-record books of all accuseds still unfound at the end of 1985—approximately 415. While his earlier random sampling of 25 of those books led him to conclude that the success of this step might be limited, it was unreasonable at that point not to exhaust every possible means of closing these cases. Moreover, it was not reasonable for him to conclude broadly that he was not likely to receive substantial assistance from relatives of these accuseds by contacting them at the accuseds' homes of record, considering that these young people usually had entered the service from their parents' home and considering the

likelihood that many of these parents still lived at the same address.

10. It was unreasonable for the Naval service to permit this active effort to revert to a passive one during 1986 and 1987; such wait-and-hope approach was no more reasonable in 1986 and 1987 than it had been from 1977 to 1984. *See* para. 4, *supra.*

11. Colonel Mitchell acted reasonably—and commendably—in deciding in 1987 that the passive means of closing these cases was not acceptable and in ordering a more aggressive and creative program.

12. Colonel Mitchell acted reasonably when he restructured appellate-administration in NAMARA and transferred responsibility for the prom project in 1988 to the new Administrative Support Division of NAMARA and removed the Military Justice Division of OTJAG from active participation in the project.

13. From 1987 to 1989, Badger and Maj. Crocker acted reasonably and diligently in pursuing all means that came to mind to locate the still-unfound accuseds and in administering this effort efficiently and responsibly.

14. In light of these efforts, Capt. De-Carlo acted reasonably when he advised Crocker in late-spring 1989 to await decision by the U.S. Court of Military Appeals in several prom project cases then pending in which the accuseds had litigated the reasonableness of the efforts and the unreasonableness of the delay.

15. After those decisions in *United States v. Myers* and *United States v. Gathings, supra,* Crocker acted reasonably in ordering the service-record books on all accuseds who had not yet been found and in mass-mailing promulgation packages to any and all addresses that could be found in those books.

16. In the remaining 144 cases in which the accuseds have not been found despite the fact that "all other reasonable efforts [have been] exhausted," *see United States v. Myers, supra* at 194, the Naval service acted reasonably when it inserted promul-

gation packages into the service-record books of these accuseds and when it accomplished publication in the *Federal Register* of a mass notice to all these accuseds of the decisions of the Court of Military Review. *See Id.*

17. In these remaining 144 cases, the Naval service has acted unreasonably in failing, thus far, to accomplish publication of notice in each case in a newspaper of general circulation in the community of each accused's home of record. *See id.* Considering the amount of money spent so far to finalize these cases—a situation that could have been avoided in the first place, *see* paras. 1 and 4, *supra*—it is unreasonable to not take this last necessary step to complete the process of constructive service.

18. Notwithstanding that, in each case in the prom project, it was the accused who placed himself beyond the initial attempt at service, no accused thereby has waived his right to petition the U.S. Court of Military Appeals for review of his court-martial conviction within 60 days of the date he receives actual notice of the Court of Military Review decision. *United States v. Myers* and *United States v. Gathings supra* at 195.

19. Notwithstanding that, in each case in the prom project, it was the accused who placed himself beyond the initial attempt at service, the extreme length and unreasonableness of the delay between date of trial and date of service on the accused in each case is substantially the responsibility of the Naval service. To fully and solely rely on an accused's technical agreement, printed on a form that he signed immediately before going on appellate leave, that he will notify his former command of any address change is not reasonable, when the accused's service-record book—replete with other address possibilities—was then readily available. As to accused's who were on unauthorized absence at the time of attempted initial service, it was not reasonable to fail to take any steps at all to serve such accused once they returned to military control.

20. No accused before the Special Master has been prejudiced in his criminal proceedings by this unreasonable delay. Thirteen of the 15 accuseds before the Special Master have asserted no error at all in their appeals to this Court, other than error relating to the delay that is the subject of this report; in the other 2 cases—*United States v. Hock* and *United States v. Greer, supra*—each accused has raised one additional error, but neither error is such that the accused "would be ... prejudiced in the presentation of his case at a rehearing ..." *See United States v. Green,* 4 MJ 203, 204 (CMA 1978).

21. No accused before the Special Master has "demonstrate[d] that [the unreasonable delay that is the subject of this report] caused him personal suffering apart and distinct from that flowing from the fact of a conviction." *United States v. Dunbar,* 31 MJ 70 (CMA 1990). Thirteen of the 15 accuseds have not asserted any such prejudice at all. In each of the two instances in which the accused has asserted such prejudice, his assertion is entirely uncorroborated; " ... relief may not be predicated upon claims of prejudice that are unverified and unverifiable." *Id.* Moreover, my findings of fact, in which I conclude that the claims are incredible, eliminates, as a matter of law, any basis for a conclusion of prejudice in those cases. *Id.*

## IV. *Recommendations*

1. The Court should conclude that the delay between date of decision of the Court of Military Review and the date of service in each case now before it is unreasonable.

2. The Court should conclude that the length and unreasonableness of the delay

is substantially the responsibility of the Naval service.

3. The Court should conclude, therefore, that each appellant has been denied speedy review of his court-martial conviction by this Court.

4. The Court should conclude, however, that no appellant was prejudiced by this denial of speedy review.

Respectfully submitted, this 19th Day of September, 1990,

/s/ Robert C. Mueller
Special Master

cc: The Judge Advocate General of the Navy
Appellate Defense Counsel
(VAN HARTESVELDT)
Appellate Government Counsel
(SCUDDER)
(SPRANCE)