UNITED STATES, Appellee,

v.

Kirklan C. CURRY, Sergeant First Class U.S. Army, Appellant.

No. 63,522.
CM 8800581.

U.S. Court of Military Appeals.

Argued March 15, 1990.

Decided Sept. 28, 1990.

For Appellant: *Captain Ralph L. Gonzalez* (argued); *Colonel Robert B. Kirby, Lieutenant Colonel Russell S. Estey, Captain Timothy P. Riley* (on brief).

For Appellee: *Captain James K. Reed* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Timothy W. Lucas* (on brief); *Major Maria C. Fernandez.*

*Opinion of the Court*

COX, Judge:

Appellant was tried at Kaiserslautern, Federal Republic of Germany, by a general court-martial comprised of officer members. Contrary to his pleas, he was convicted of 2 specifications of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to E-1. The convening

authority approved the sentence; the Court of Military Review affirmed in a short-form opinion.

We granted review of these issues:

I

WHETHER THE MILITARY JUDGE IMPROPERLY DENIED A DEFENSE MOTION TO SEVER ADDITIONAL CHARGE I AND ITS SPECIFICATION (PREMEDITATED MURDER) FROM APPELLANT'S TRIAL.

II

WHETHER THE EVIDENCE IS SUFFICIENT AS A MATTER OF LAW TO SUPPORT THE FINDINGS OF PREMEDITATION TO CHARGE I AND ITS SPECIFICATION (PREMEDITATED MURDER).

III

WHETHER THE EVIDENCE IS SUFFICIENT AS A MATTER OF LAW TO SUPPORT THE FINDINGS OF GUILTY TO ADDITIONAL CHARGE I AND ITS SPECIFICATION.

IV

WHETHER THE MILITARY JUDGE'S FAILURE TO GRANT APPELLANT'S MOTION FOR MISTRIAL, FOR CUMULATIVE ERRORS, DEPRIVED HIM OF A FAIR AND IMPARTIAL PROCEEDING.

V

WHETHER APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO PRESENT ANY POST-TRIAL MATTERS ON CLEMENCY DESPITE APPELLANT'S SIXTEEN YEARS OF VALUABLE MILITARY SERVICE.

*Sufficiency of Evidence*

A

The charges in this case involve the tragic and senseless deaths of appellant's two infant sons, Erik Lee Curry (14 weeks) and Kirklan Lee Curry (10½ months). Before proceeding to the severance question, it is first necessary to review the legal sufficiency of the evidence regarding each specification (granted issues II and III). The story unfolded in the following manner:

Erik Lee Curry

On May 12, 1987, Dr. (Captain) Kirin Marie Russell was on duty as Chief of Emergency Medical Services, Landstuhl Hospital. According to the doctor's testimony:

I was sitting at the nurse's station and it was fairly quiet, and I was alone. And I saw a man walk in and he had not stopped at the receptionist desk, so I wondered what he wanted, and I just looked up at him. And he kept approaching me but didn't say anything. And as I was watching him, I noticed that he was carrying something, looked like a blanket. And I thought, well maybe there's something in this blanket. So I stood up, and as I did, I saw that there was a blue infant in the blanket, and the man just handed this baby across the counter to me. And I then took the baby and ran with it into the trauma room, called for a nurse, called for pediatrics— you know, said, someone please call pediatrics. And he followed us in there and stood there as we were attempting to resuscitate the infant. And I asked him to please leave and he didn't respond. Well, I said, if you're not going to leave, just sit on the floor. And then, sometime later, he left the room.

A team of physicians was quickly assembled; massive medical efforts were commenced; and a weak heart beat was restored. However, notwithstanding heroic measures throughout, the baby died 2 days later. In retrospect, the doctors assumed the baby was brain dead when he was brought in.

The man who brought in the baby was appellant; the baby was his 14–week–old son, Erik Lee Curry. Due to the crisis circumstances, Dr. Russell had little opportunity to communicate with appellant. Asked if she "notice[d] the demeanor of the person who brought in the child?," she responded:

> Yeah. He just walked in very slowly. There didn't appear to be anything urgent that was going on. He was very quiet, staring, responded very little to my questioning, and that's pretty much describing his demeanor.

In her experience in emergency medicine, she had "never seen anyone act this way."

Dr. (Captain) Paul John Evans, Staff Pediatrician, Landstuhl Hospital, was one of the first of the doctors responding to the emergency. He discovered "a lot of blood in the back of the eye." X-rays and CAT scans taken the next day "showed some old healing rib fractures" and "a lot of blood accumulated between the skull and the brain."

When asked what the symptoms indicated, Dr. Evans testified:

> In this case, since there was no history of a major motor vehicle accident, there was no outward signs of bruises, and the combination of old rib fractures, the blood we saw on that part of the brain or in between the skull and the brain, and the blood in the eyes, is what we call the "Shaken Baby Syndrome." In other words, the baby had been very violently shaken back and forth causing shearing forces that the brain separates from the skull and causes a lot of blood to accumulate there—shears off of the veins.

With respect to the "retinal hemorrhaging," the doctor explained:

> Basically, it's a similar mechanism of injury, in that the—there are arteries and blood vessels that enter into your eyeballs, and with vigorous shaking those can shear and break, and the inside of your eyeball can fill up with blood. And, it also is a very common finding in child abuse. In fact, it is a finding that is very heavily suggestive of child abuse.

During the first day at the hospital, Dr. Evans had several occasions to update the parents on Erik's condition. By this time the mother, Mrs. Denise Brangasitis,[1] was present. The doctor noticed that Mrs. Brangasitis "seemed to be angry" at appellant, and the doctor "had the feeling that she was maybe hiding something or not being upfront." But he "had the same impression from the father."

The parents told the doctor the following:

> [T]he baby had been basically normal the night before, had fed well around 11:30 that night, had slept the night through, and the mother had checked on the baby at 5 to 7 when she left that morning. Things were fine. The father said the baby woke up, acted normally, and he'd brought the baby out and sat the baby I think on the living room couch while he went into the kitchen to get something, some formula, to drink, and heard some funny noises; went back, the baby was making gurgling noises, and he picked the baby up, baby cried, and then kind of went limp. At that point he said he shook the baby and started basic cardiopulmonary resuscitation from breath to the mouth and some feeling for the heart rate, and maybe some cardiac massage.

\*    \*    \*    \*    \*    \*

> [H]e did know that the heart was slow and at that point decided to wrap the baby up and drive from his place in Kaiserslautern to our hospital in Landstuhl.

In the doctor's opinion, "the story that was being given me made no sense medically." The doctors "looked at certain studies, and given the history and the lab studies, we had no—we found no evidence that

---

1. Appellant was first married to Beth Curry, the mother of Kirklan Lee Curry, who died in 1976. After their divorce, appellant married Joanne Curry, from whom he was separated, but not divorced, at the time of trial. There were no children of this marriage. Like appellant, Mrs. Brangasitis was married, but separated, at the time of trial.

the baby had any underlying predisposition to easily bleeding."

Rather, the violent shaking and the resulting rapid accumulation of blood in the brain

can cause the brain to swell. When the brain's oxygen is cut off or there's significant immediate stress to the brain, especially infants, respond by just kind of turning everything off. The heart rate drops perceptively. They stop breathing. And the swelling that occurs, sometimes very quickly, can even cause the brain stem to what we call herniate down into the spinal column here. There's a small opening in the base of the skull, where the very important centers are at the base of the brain that control heart rate, breathing, your blood pressure, and if that gets pushed down, or a lot of acute stress or swelling on it, then the infants can die right away.

Regarding the effect of the shaking on Erik, the doctor opined:

Immediate effect of it, he probably lost consciousness, probably quickly, when it happened. The longer term effects, within 4 to 6 minutes if your brain is not profused or blood does not flow to your brain, then you start to have some permanent damage. And when the baby arrived, his brain acted as if it were dead. The baby was very cold though. We had to warm the baby up. The baby's brain still acted as if it did not function, and the next day we were able to do some tests to show that there really was no more blood going above the neck. Essentially, the entire brain had died.

Dr. (Major) Ruly Yoediono, a forensic pathologist and Chief of Anatomic Pathology at the Second General Hospital, Landstuhl, performed an autopsy on Erik Lee Curry on May 15, 1987. He determined the cause of death to be "diffused subarachnoid hemorrhage," meaning a hemorrhage between the arachnoid membrane which covers the brain and the brain itself. The hemorrhage was caused by the rupture of blood vessels, and the ruptures were caused by the baby being shaken. By "diffuse," the doctor meant that "it's covered the entire surface, almost entire surface of the brain." The hemorrhaging in turn caused "cerebral edema," meaning "swelling of the brain." The effect of the hemorrhaging was "enough to cause the death of the baby," enough to "stop the brain function."

The cerebral hemorrhaging and retinal hemorrhaging indicated "Shaken Infant Syndrome." Though this was the first such case Dr. Yoediono had actually worked on, he was familiar with other cases and had read the reports and studies. In his experience, "[t]his is one of the severe—severest case I've ever seen."

In addition, the autopsy revealed that the baby had several broken ribs. Two of the fractures had begun to heal; another one had not. In the doctor's opinion, the ribs had been broken at least 2 or 3 weeks before the infant's death, and possibly as much as 7 to 8 weeks earlier. The witness believed the ribs were broken by "blunt force trauma" requiring "[a] large amount of force." He also considered it possible that the injuries could have occurred by squeezing with great pressure.

Further, the autopsy revealed a "chip fracture of the ... tibia bone." The only way the doctor could imagine this type of fracture occurring was "by grabbing the leg and jerking it." He went on to explain that

[t]here is a difference between the child and adult in that the attachment of tendon to the tip of this bone in adult is where the bone is strong, where if you tried to jerk the lower leg of an adult then what happens is that you are going to lacerate the tendon because of the strong attachment to the bone. But in babies, this portion of the bone is weak, so an attachment of the tendon to the bone is strong, so whenever you grab and jerk instead of having a ruptured tendon, you have a fractured tip of the bone.

To accomplish this type of injury would require "a tremendous amount of force."

Dr. Yoediono concluded that the "manner of death" was "homicide."

On cross-examination, the witness agreed that no evidence was found that this child had been severely shaken previous to this incident. He could not estimate how much force was actually used in shaking the child, only that it "was more than medically necessary to revive a child." He could not estimate how long the shaking would have to have occurred to accomplish this result.

The next prosecution witness was another forensic pathologist, Dr. (Commander) Glenn N. Wagner, MC, USN. He was a staff pathologist with the Armed Forces Institute of Pathology, Washington, D.C. His primary duty was as

Chief of Operations responsible for the investigation of military aircraft accidents worldwide, forensic cases involving death investigations primarily, reconstruction of accident cases in which there is a question as to who might be driving or who was a passenger, identification issues in mass disasters particularly involving either our government or foreign governments.

He had performed about 250 autopsies on children. With respect to "Shaken Infant Syndrome" victims alone, he had examined "[b]etween 50 and 70 actual bodies, and maybe another 30 cases in consultation; so approximately a hundred cases in one fashion or another." Among his numerous published articles, two dealt specifically with child abuse.

Prior to commencing his medical career, he worked for "six years as a homicide detective and policeman in the Philadelphia Police Department, most of that in the Crime Laboratory as a criminalist, toxicologist, and detective." Before testifying in this case, he familiarized himself with the reports and pathological evidence relating to Erik's death. Dr. Wagner greatly amplified the description of Shaken Infant Syndrome in general and the specific injuries to Erik.

With respect to the eye hemorrhages, Dr. Wagner described the fluid-filled portion as having the consistency of "[a] grape or jello.... Actually, a grape is probably more—a better description than jello." Animal studies "showed that there was a significant amount of force having to be delivered over a prolonged period of time in order to get eye hemorrhages of any magnitude." Regarding how much force would be required to cause the injuries to Erik, the doctor estimated:

The literature and my own experience, these hundred cases, clearly indicate that it's violent shaking over a period of time. It's not just violent shaking, it's very violent; indeed, savage shaking, and therefore is more a function of great energies, rage, or great anger. As a result, there is violent shaking that goes over a period of time. Now, no one that I'm aware of is going to stand by and time these injuries unless it's on an animal model or on some other type of model. So, I don't think we really have good numbers on people unless it's coming from testimony or it's coming from eye witnesses. But it would appear to be a continued activity over a time.

As to the mechanics of the blood getting into Erik's eyes, the doctor explained:

The amount of tearing that would take place is essentially thousands upon thousands of minute hemorrhages with the blood being forcibly driven back into the fluid of the eye, which as I said is a little firmer in a child than it is in an adult.

Regarding "the amount of blood, the severity of the hemorrhages, in this baby's [Erik's] eyes, compared to all of the other infants, victims, whom you have observed of 'Shaken Infant Syndrome,' " Dr. Wagner responded: "It's categorically the worst."

As to the injury to Erik's brain, the witness found

[t]hat there was subdural hemorrhage although it was minimal; diffused subarachnoid hemorrhage; marked cerebral edema [swelling], which on one photograph shows that there was beginning of herniation [brain, attempting to escape skull due to swelling, compresses vital nerve centers controlling respiration and

heart rate, causing death] which explains why there was respiratory arrest or why the baby was unable to breath.

Dr. Wagner dated Erik's rib fractures at "about 6 to 8 weeks old," noting that, "on the basis of lamellar bone and woven bone, ... [they] are injuries that have been reinjured repeatedly."

On cross-examination, Dr. Wagner agreed with the proposition that,

what typically is the case [of Shaken Baby Syndrome] is where the adult becomes angry with the child typically crying.... Takes up the child and begins to shake it.... And the intent there in these cases is not to injure or to kill.... It's to stop the crying.

On redirect, when asked again how long such shaking would have to have occurred, the doctor explained:

I was first asked that, and I said 3 to 5 seconds. Pure speculation. It's not been witnessed. To me, 3 to 5 seconds can be a long time. The animal studies make it minutes, as much as 30, 40 minutes [of 'violent shaking']. So, maybe it's somewhere between the two. I don't know.

### Kirklan Lee Curry

Erik's death and the medical conclusion as to its cause brought back to light nagging questions about the death of appellant's other son, Kirklan Lee ("Kirky") Curry, 11 years earlier. Kirky died in Alexandria, Virginia, in an area not under military control. The events took place prior to the Supreme Court's decision in *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), when military jurisdiction over off-post crimes was strictly limited. *See O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). Accordingly, control over the investigation was exercised entirely by civil authorities. Ultimately, Kirky's death was ruled "accidental," and no charges were filed against appellant or anyone else.

It is undisputed that, at the time of Kirky's death, appellant's then-wife, Beth Curry, was in the process of leaving appellant. She was staying with friends while looking for an apartment for herself and Kirky. It was during a brief period when appellant had sole custody of Kirky that he died.

Investigator Thomas E. Morehead of the Alexandria, Virginia, Police Department, Homicide Section, headed up the police investigation of Kirky's death. He testified as a prosecution witness at appellant's court-martial. He recalled arriving at appellant's apartment shortly after the paramedics on the day Kirky died, May 10, 1976. Kirky had already been "pronounced dead."

In a written statement taken that night by Investigator Morehead, appellant failed to indicate any abnormality in Kirky during the day. After feeding him in the afternoon and placing him in his playpen, according to the statement, appellant took out the trash and managed to lock himself out of the apartment without a key. It took "15 to 20 minutes" before appellant was able to regain entry to the apartment with another key. He looked in on Kirky at that time, and he appeared to be sleeping normally. He checked on Kirky 45 or so minutes later, "and he was cold." Thereupon, appellant attempted "mouth-to-mouth [resuscitation] and heart massage," but to no avail. Appellant also "poured some water on him ... [to] wash vomit off his face." Appellant then "went bananas and ... [was] not sure what ... [he] did after this." He did manage to call the clinic at Fort Myer, Virginia, "and they must have called an ambulance."

In the same written statement, appellant explained:

I took some plastic off some cleaning and I put the plastic in the trash can in the bathroom. I later found it hanging out and I put it back again. I did not see the baby with any plastic.

Nine days later, appellant made another written statement for Investigator Morehead. This statement was more detailed

than the previous one but essentially similar. With respect to appellant's actions after discovering Kirky "cold," he stated:

He had vomited and I took my finger and cleaned out his mouth and then proceeded to give him mouth to mouth. I then went to the bathroom and got some water to pour on the face and to rinse the vomit out of his mouth. I then gave mouth to mouth again and also heart massage. I then called The Radar Clinic at Ft. Myer and they told me some things to do. I remember that I had already done all but one of the things but I cannot recall what they told me to do. They told me to call the Rescue Squad and I told them that I didn't know the number. They then asked me my address and said they would call.... After I had hung up from talking to the Radar Clinic I tried to call my Commanding Officer and also my Lieutenant but they were not home. I carried the baby to the couch before the arrival of the rescue squad. I also poured some more water on him while in the living room.

Regarding the plastic in the trash can, appellant explained:

The plastic that was taken off my clothes and found in the trash can in the bathroom was on a civilian suit. It had been there for about a month. I was cleaning up is the reason that the plastic was removed. I put the plastic in the trash can and later during the day I observed that the plastic was sticking out of the trash and I once again replaced it in the trash can. At no time did I observe the baby with any of the plastic or playing with it.

Indeed, when Investigator Morehead initially checked Kirky upon arriving at the apartment, he discovered "a small piece of plastic" wrap in Kirky's mouth.[2] A larger, similar piece of plastic was found in the playpen. These pieces of plastic, along with the plastic clothes wrapper from the trash can in the bathroom and plastic found

in the kitchen, were sent to a laboratory for analysis. The laboratory reported that the plastic found in Kirky's mouth and that found in the playpen were of the same thickness and composition. However, the plastic from the trash can and the kitchen were different and could not have been the source of the plastic found in the playpen and Kirky's mouth.

When this information was presented to appellant, on August 2, 1976, his story changed. As Investigator Morehead testified on direct examination:

He stated that he had taken some plastic off of a uniform and had draped it over the crib and close to the playpen. That the telephone rang, he went out and answered the telephone. He came back in and the baby had the plastic and had it over his head.

Q. Let me stop you there. You said that the plastic was draped over the crib?

A. Draped over the crib, yes.

Q. And where was the baby at that time?

A. The baby was in the playpen.

TC: Okay. Continue, please.

A. And he said that the plastic was over the baby's head, that the baby threw-up and then quit breathing. He then proceeded to perform CPR on the child and it started breathing again. He took the plastic that was draped over the playpen and took it out and put it down the trash chute. He came back to the apartment. He was locked out and then had to get the resident manager's son to let him back in the apartment. He came back into the apartment, looked in on the baby, and the baby appeared to be sleeping. And then he proceeded to watch television. Later on then he found the baby cold.

When Investigator Morehead initially examined the body in the apartment, he "noticed a bruise on the right side of the forehead." In addition, he "also checked

**2.** The paramedic who first attempted to revive Kirky also extracted a small piece of plastic wrap from his mouth. It is not clear whether

this was the same piece of plastic later discovered by Investigator Morehead.

his eyes and there was what is called the Petechiae hemorrhaging in the eyes." At the civilian hospital, he also "noticed several bruises on the chest." From the hospital at Fort Belvoir, Virginia, Investigator Morehead seized records indicating that Kirky had been diagnosed as suffering from "[b]attered child syndrome" at the age of 5 months. Investigator Morehead did not recall talking to the pathologist before the original autopsy on Kirky.

The prosecution's next witness was Beth Curry, Kirky's mother. She recounted a saga of spousal and child abuse, and the disintegration of the couple's 4–year marriage.[3] According to Ms. Curry, the problems began when Kirky was 6–8 weeks old; appellant started complaining that she was paying too much attention to Kirky and not enough to him. That is when he began beating her. About 4 months before Kirky died, Ms. Curry began "going out once a week or once every two weeks." She "would go out with a girlfriend ... to this little bar...." According to Ms. Curry, it was initially appellant's "idea" for her "to get out and get away from the home for a while," but he quickly became jealous, "accused" her of "being out with someone," and she "caught a lot [of] beatings then." Among other injuries, she suffered "a cracked rib and a scar over ... [her] right eye." On another occasion, he "ripped" an earring out of her ear. He also choked her "[q]uite a few times."

Ms. Curry described the incident in which she took Kirky to the Fort Belvoir hospital. According to her, she woke up one morning to find bruises all over Kirky's body. Appellant had been home the night before but went to the field that day. She took Kirky to the hospital without appellant's knowledge. Kirky was admitted to the hospital for 6 days, and that is when the child-abuse diagnosis was made. She did not tell appellant about it until he returned. When she told him, he "got very upset and angry

with me because I took him, and he slapped me."

According to Ms. Curry, appellant frequently

bragg[ed] about how he could cut off somebody's air by pushing a certain place in your throat.... And that it wouldn't be detected by anyone, the police or anything. And my mom had asked him, "Where?" and he had showed her a place on, I mean he went over and touched her throat and showed her where. And he used to tell me that all the time, too, that he could do it.

Ms. Curry described another incident when they were visiting her mother:

Well, it was about the third night that we were there. I had trouble getting the baby to sleep that night because he was teething. And he finally did go to sleep and I had gone in to the back with my mother. And all of a sudden we heard the baby screaming, so I went into the bedroom. And Kirk had him up in his arms, and I took him out of his arms. He was just real limp and I took him out of his arms and laid him on the bed. And his eyes were all bugged out, he couldn't breathe, he was shaking. And my mom took him and kind of shook him a little bit and blew in his face a couple of times and got him to breathing. So my mom told Kirk to take us to the hospital. And he told me that the baby was fine, we didn't need to go to the hospital. And my mom told him, she had to kind of threaten him, she said, "If you don't take them, then I'll take her." And so he went out to start the car and he sat out there for about five minutes and then he came back in and said the car had to warm up. And my mom said, "Well, the hell with this, I'll take her in my car." So we went and he didn't even go, he followed us in his car. And then when I got to the hospital, he wouldn't even

---

**3.** The prosecution's theory was that appellant murdered Kirky to punish Beth Curry. The uncharged evidence of abuse directed against Ms. Curry and Kirky was offered to prove appellant's motive and intent. The court members were instructed by the military judge as to the proper use of the evidence during presentation of the evidence on the merits. At the behest of the defense, no further instruction was given at the conclusion of the evidence.

come in. We went into the hospital, and my aunt was an RN, and the doctor on the staff wasn't there, but she was there. She checked him over and she said that the only thing that she could find, there was a red spot on this throat right here [indicating]. So we went back home that night and I put the baby back to bed. And then that night when I went to bed, Kirk choked me in the bed and slapped me and told me not to ever go against his wishes again.

She described another incident "when he was shaking the baby and then I grabbed the baby out of his arms, and when I did, he shoved me up against the wall and I fell to the floor."

Ms. Curry decided to leave appellant on May 2, 1976—8 days before Kirky died. According to Ms. Curry, appellant told her that, if she left, "he would take what was most precious in my life away from me." On May 8, a Saturday, Ms. Curry returned to drop off Kirky, "[b]ecause ... [she] had no place to go or no place for ... [them] to stay." When she dropped Kirky off, he was fine and had no marks on him. She and appellant "got into an argument and he took ... [her] back into the bedroom and threw ... [her] on the bed and choked" her. She was supposed to pick Kirky up the next day at 6 p.m. When she returned at the appointed time, "there was a note on the door saying that him and the baby was out of town."[4] The unit confirmed that appellant had a 3-day pass.

The next day, Monday, May 10, she returned at noon, at 3:00, and again at about 7:00. The first two times appellant wouldn't answer the door. She called him twice, and they argued about money. She "told him that ... [she] was coming over to pick him [Kirky] up, and he said he wouldn't be there." She returned at 7:00 to find the police—and Kirky's body.

\* \* \* \* \* \*

After the funeral, Ms. Curry moved some of her clothes out of the apartment.

Appellant was there and told her "he would get ... [her] for this." After a period of time, however, she moved back in with him. One of the reasons given was that she "loved him." Indeed, she became pregnant again, but "had a miscarriage."

Another reason Ms. Curry moved back with appellant was that she wanted to know if he had murdered Kirky. According to her, the abuse continued. On one occasion, he threatened her with a gun. On another, he choked her until she passed out. On another occasion, he had nonconsensual, anal sex with her—"He said he was punishing me for what I made him do to Kirky." He threatened that "he would do to ... [her] what he did to ... [their] son"; and "he said that no matter what ... [she] said, ... [her] word didn't mean anything, that it was ... [her] word against his." These statements allegedly occurred after Kirky's death, and Ms. Curry never reported them to Investigator Morehead.

Ms. Curry's mother, Mary Beth Beshears, corroborated much of Ms. Curry's testimony. She confirmed that appellant used to complain that Ms. Curry "spends all her time just spoiling him [Kirky]. She don't have no time for me or nobody else." Mrs. Beshears described the incident when appellant, Ms. Curry, and Kirky visited her:

Well, this particular night little Kirky was very ill and my daughter finally put him to bed, and when he was asleep she told me she wanted me to go to the bathroom, she had some perfume she wanted to show me. So we got up and went to the bathroom and while we were in there, the baby just screamed to the top of his voice. And we run back in the living room and Kirk had him. He was just lifeless, he had no control over his body, he wasn't breathing, jerking all over. And my daughter took him away from him and laid him on the bed. And I shook him a little bit, blew in his face a couple of times and he tried to start breathing then, but he was still trembling and shaking all over.

4. Actually, appellant was helping another servicemember move at the time. A neighbor in

the building where appellant lived, Ms. Hodo, was babysitting Kirky. *See infra.*

Mrs. Beshears related that appellant refused to take the baby to the hospital and told her daughter, "No, you're not taking him." Mrs. Beshears then had to drive Ms. Curry and the baby to the hospital; appellant followed in his car but did not enter the hospital. Mrs. Beshears corroborated that the nurse (Ms. Curry's aunt) "couldn't find anything wrong with ... [Kirky], other than she found a big red spot right here on his throat."

On the way home from the hospital, Ms. Curry asked her mother not to go to work the next day because appellant would beat her for taking the baby to the hospital. The next morning, Mrs. Beshears noted "fingerprints around her [Ms. Curry's] neck, bruises." Ms. Curry explained that appellant had "choked her in the bed."

Mrs. Beshears testified that, during their visit, appellant

said that he could cut anybody's air off. He said, "As a matter of fact, I could kill everybody in this room and nobody would know what happened." And I said, "Well, Kirk, they would, they could run an autopsy." He said, "Nothing would show up but suffocation." That didn't really register on me until the night we took the baby to the Emergency Room when he had this red spot in his throat, because he did tell me, show me where he could press to cut your air off. And that's when it registered on me.

Another prosecution witness, Geri Kay Hodo, was a neighbor of the Curry's at the time of Kirky's death and afterward. She baby-sat Kirky the night before he died.[5] She was familiar with the Currys' arguments and once noticed that "very red marks" "[c]ompletely circled ... Ms. Curry's neck." She described how appellant

knocked on my door early one morning and stood with a Polaroid picture saying the baby had died last night.... He didn't seem upset. He just held the Polaroid picture in front of him and turned it around and looked at it, and shook his head, and turned it around so I could see it.

Another prosecution witness was Master Sergeant Steven Corey. He had been Ms. Hodo's husband at the time of Kirky's death. He was also in the same unit as appellant and of the same rank. MSG Corey knew appellant and his wife were having marital problems. The witness and appellant sometimes discussed personal matters. The witness remembered that, on one such occasion, appellant stated that "if she [Ms. Curry] left me, she would never see himself or the baby again."

MSG Corey also remembered the time appellant came to their apartment the morning after Kirky died. According to MSG Corey,

He brought down a picture and showed me and Geri the picture.... And he set the picture on fire, put it in the ashtray on the table, and left.

The first time MSG Corey and appellant had a chance to speak privately after the funeral, they were in their squad room. As MSG Corey recalled it:

I was in there, it was either late morning, and we were changing clothes for some reason. I can't remember why. Some squad members were in there. They were getting ready to depart. Sergeant Curry came in, walked over to the window, was gazing out the window, and I believe I was changing shoes or something. And, he looked over at me and he smiled and he said, "Sergeant Corey, I believe I got over on this one."

On November 16, 1987, the skeletal remains of Kirklan Lee Curry were exhumed from Arlington National Cemetery under the supervision of Dr. Wagner, one of the pathologists who testified regarding the death of Erik Lee Curry. The contents of the casket were x-rayed and examined by Dr. Wagner and others working under his direction. In the opinion of Dr. Wagner, "[t]he casket clearly had not been interfered with," although the "lid had collapsed in on the ... remains," causing certain of the bones to fracture.

However,

---

**5.** *See* n. 4, *supra.*

[t]he fractures of the ribs fell into two categories. There were clearly, particularly based on the X-ray examination, fractures that were in varying stages of healing. That involved the 11th rib on the right and the 10th, 11th, and 12th on the left, possibly the three above that on the left, as well.

Other fractures occurred after Kirky's death and were the result of interment.

It was possible to identify the breaks that preceded death, because of the "swelling ... [on them] called a callus, ... [which] is the body's attempt to reunite broken bone." Based on studies by radiologists and orthopedic pathologists, Dr. Wagner dated the fractures

from 6 to 8 weeks [before death] to as much as a 12 weeks, depending on how much continuing injury occurred in the rib fractures. Each of these fractures, not only were injured once, but were repeatedly injured. And so we have multiple attempts by the body to heal these ribs. And that can be measured by the amount of woven bone and lamellar bone, which are various ways in which bone can be deposited.

In the witness' opinion, "The re-injury would indicate a high probability that the trauma was repetitive."

On cross-examination, the doctor agreed that the rib fractures could possibly have occurred by someone holding the baby at the ribs and "pressing," or by holding him "up in the air ... applying force while shaking it." On re-direct, the witness explained that, since a "child's skeleton is in fact more cartilage than bone, and therefore far more elastic," the amount of pressure required to break a child's ribs, while "it's [n]ever been measured," was "a lot." Based on the nature of the fractures, Dr. Wagner was "absolutely certain that ... [they were] not the result of [cardiopulmonary] resuscitation."

The only other fracture observed in the remains that might have occurred during Kirky's life was a jaw fracture. If so, it would have occurred close to the time of Kirky's death because there was no evidence present after 11 years that the body was trying to mend itself. Bruises noted on the exterior of Kirky's jaw corresponded closely with the fractured bone beneath. The witness considered the jaw fracture "less likely to be an artifact" break (*i.e.,* resulting from interment) since none of the skull bones were broken.

Numerous bruises were observed and recorded by Investigator Morehead and the original pathologist. Photographs taken shortly after death also depict the bruises. In Dr. Wagner's opinion, the different coloration of the bruises indicates that the injuries occurred at different times. According to the witness, "[I]f the bruises were a result of falling down and picking oneself up in the process of walking and playing, one would expect to see far more bruising of the arms and legs, possibly even of the buttocks, depending on where." However, there was none of that. Rather, the bruises were concentrated about the head, neck, and torso of the child—"an unusual location relative to everyday activities in this child," according to the witness. The bruises on the neck were consistent with choking.

Dr. Wagner knew the pathologist[6] who performed the original autopsy on Kirky, and he had reviewed the documents pertaining to that examination. He described the pathologist, a public official, as a "workaholic," who performed "probably a thousand [autopsies] a year." For a variety of reasons, the original autopsy was deficient. For one thing, no X-rays were taken. These would have revealed the fractures and undoubtedly led the pathologist to expand the examination. To compound matters, the examination was conducted "at a time when rigor mortis was complete." This made it much more difficult to detect fractures by palpation. Finally, it does not appear that the original pathologist was

6. This pathologist was unable to travel to Germany to testify due to deteriorating health. He was, however, available to testify via telephone, either at the court-martial or in a deposition. Neither the prosecution nor the defense desired his testimony, however.

aware of the prior diagnosis of battered child syndrome or the type of information presented at trial by Ms. Curry, Ms. Hodo, Mrs. Beshears, and MSG Corey.

The original "REPORT OF AUTOPSY" listed the "Cause of Death" as "CONSISTENT WITH UPPER AIRWAY OBSTRUCTION—FOREIGN BODY (PLASTIC FILM)." The "REPORT OF INVESTIGATION BY MEDICAL EXAMINER" listed the "MANNER OF DEATH" as "Accident." Based on the evidence available 11 years after the fact, Dr. Wagner could not rule out the possibility of accidental death in this case. However, "from a purely medical point of view," he could also not rule out the possibility of forcible asphyxiation.

He noted in particular that "agonal vomiting" often accompanied asphyxiation. By "agonal," he meant "associated with the ... [d]ying process." Asked whether, in his experience, there was a "tendency ... to clean up a death scene," he responded:

It's quite common where the death is unexpected, and I see that most commonly in child abuse cases and in suicides. Most of the time it's explainable by the family wishing to either make the body more presentable or concerned about how the death might be interpreted.

He had never, in his experience, seen a death scene cleaned up in the case of an accident.

In Dr. Wagner's opinion, the cause of death was still asphyxiation. He just couldn't say "exactly what kind of asphyxiation." In his opinion, Kirky was "an abused child who had suffered previous trauma on a repetitive basis prior to his death.... [T]he asphyxiation could equally have been a smothering or a type of smothering as easily as it could have been from the plastic." He based this opinion on "[t]he injuries to around the head and neck and the previous trauma." Dr. Wagner could not make a finding that the manner of death was accidental.

The defense theory of the case was that the death of Kirklan Lee Curry was accidental—just as the medical examiner had determined 11 years earlier. Regarding Erik Lee Curry, the defense conceded he was a battered child, but contended appellant did not realize that shaking him could cause death. With respect to both children, the defense argued that appellant was unaware their ribs were broken. The defense case on the merits was reactive, based almost entirely on cross-examination of government or court witnesses. Appellant did not testify.

B

Premeditated murder is denounced in Article 118 of the Uniform Code of Military Justice in the following terms:

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—

(1) has a premeditated design to kill;

\* \* \* \* \* \*

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) ..., he shall suffer death or imprisonment for life as a court-martial may direct.

The Manual for Courts–Martial, United States, 1984, lists these elements:

(a) That a certain named ... person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had a premeditated design to kill.

Para. 43b(1), Part IV. "Premeditation" is further described in these terms:

A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill have been entertained for any particular or considerable length of

time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. *The existence of premeditation may be inferred from the circumstances.*

Para. 43c(2)(a), Part IV (emphasis added).

Granted issues II and III challenge the sufficiency of proof of the respective premeditated-murder specifications. This Court is limited to review "only with respect to matters of law." Art. 67(d), UCMJ, 10 USC § 867(d). Our standard for reviewing sufficiency of evidence, as a matter of law, is

> whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Johnson,* 30 MJ 53, 57 (CMA 1990).

The court-martial and the Court of Military Review have already concluded, as a matter of fact, that each and every element of the offense was established as to both crimes *beyond a reasonable doubt.* On this record—considering each offense in complete isolation—we concluded that such findings could properly be made.

■ Regarding the death of Kirklan Lee Curry in 1976, the suggestion is that the testimony of Beth Curry so lacked credibility that premeditation was not proven. In addition, it is claimed that evidence established that the death was accidental. We reject the first contention because the factfinder need not have found Ms. Curry's testimony incredible. Moreover, there was abundant evidence from which the factfinder could have otherwise inferred premeditation. Further, although there may have been no *direct* evidence of the "manner of death," the evidence tending to prove his threats, boasts, admissions, motive, and demeanor, coupled with his change of story, destruction of evidence, and prior abuse, was more than sufficient to permit the factfinder to infer that asphyxiation was other than accidental.

■ Regarding the death of Erik Lee Curry in 1987, the suggestion is that, although there may have been plentiful evidence of the manner of death, *i.e.,* the violent shaking by appellant, evidence of premeditation and intent was lacking. Again, we reject the argument for, although there may have been no *direct* evidence of premeditation and intent (such evidence could only exist in the case of an admission or confession of guilt), there was substantial circumstantial evidence from which these elements could be inferred. This evidence included the extraordinarily violent nature of the shaking, appellant's demeanor at the hospital, the prior abuse on the child, and appellant's medically nonsensical account of the events.

Therefore, we reject the contention that the evidence was legally insufficient to sustain findings of guilty of premeditated murder.

### Severance

This leads us to what is undoubtedly the major issue in the case: whether it was permissible to try the two offenses together. Prior to the hearing on the merits, the defense moved to sever the specifications. After soliciting the views of the parties, the military judge denied the motion, citing

> the experience of this court that the panel members are able to follow the rule of law and the instructions of the court, and whether or not the balancing test is required of the military, I balance the issues and the evidence, and the court feels that after balancing all the issues and the arguments made by counsel that there is a . . . the danger of undue prejudice to the defendant is not apparent.

■ For purposes of this appeal, we will assume appellant would have had a better chance at outright acquittal or conviction of lesser charges if the offenses were tried separately and the "other-crime" evidence was excluded. In other words, we assume there was a risk of some "spillover" between these offenses, notwithstanding lim-

iting instructions. Spillover, however, is not the sole consideration, *e.g.*, *United States v. Ferguson*, 776 F.2d 217, 224 (8th Cir.1985), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986); *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir.1984), and the question remains whether the joinder was permissible.

The complete military rule on joinder of offenses, RCM 601(e)(2), Manual, *supra*, is as follows:

*In the discretion of the convening authority, two or more offenses charged against an accused may be referred to the same court-martial for trial, whether serious or minor offenses or both, regardless whether related.* Additional charges may be joined with other charges for a single trial at any time before arraignment if all necessary procedural requirements concerning the additional charges have been complied with. After arraignment of the accused upon charges, no additional charges may be referred to the same trial without the consent of the accused.

(Emphasis added.) The non-binding Discussion following this provision adds that "[o]rdinarily all known charges should be referred to a single court-martial."

Regarding severance of offenses, RCM 906(b) provides, in pertinent part:

The following may be requested by motion for appropriate relief. This list is not exclusive.

\*     \*     \*     \*     \*     \*

(10) Severance of offenses, *but only to prevent manifest injustice.*

(Emphasis added.) Again, the non-binding Discussion following this provision adds:

Ordinarily, all known charges should be tried at a single court-martial. Joinder of minor and major offenses, or of unrelated offenses is not alone a sufficient ground to sever offenses. For example, when an essential witness as to one offense is unavailable, it might be appropriate to sever that offense to prevent violation of the accused's right to a speedy trial.

Of course, both RCM 601(e)(2) and 906(b) were prescribed by the President pursuant to express Congressional delegation. Art. 36, UCMJ, 10 USC § 836. Appellant, however, criticizes the RCM 906(b) "manifest injustice" standard. He notes that Article 36 empowers the President to prescribe rules

which shall, so far as he considers practicable, apply the principles of law and the rules of evidence *generally recognized in the trial of criminal cases in the United States district courts,* but which may not be contrary to or inconsistent with this chapter.

(Emphasis added.)

According to appellant, RCM 906(b) is at odds with federal principles of law. Curiously, however, he does not cite the federal rules; rather he cites the proposal on severance in § 13–3.1(b)(i), ABA Standards, Joinder and Severance (2d ed. 1986 Supp.). In the view of the American Bar Association, expressed in § 13–3.1:

(a) Whenever two or more *unrelated* offenses have been joined for trial, the prosecuting attorney or the defendant shall have a *right* to a severance of the offenses.

(b) The court, on the application of either the prosecuting attorney or the defendant, should grant a severance of *related* offenses:

(i) before trial, whenever severance is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or

(ii) during trial, whenever, upon the consent of the defendant or upon a finding of manifest necessity, severance is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.

(c) When evaluating whether severance is "appropriate to promote" or "necessary to achieve" a fair determination of the defendant's guilt or innocence for each offense, the court should consider among other factors whether, in view of the number of offenses charged and the

complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

(Emphasis added.)

On its face, this ABA standard is vastly different from the federal rules. The federal rule on joinder and severance of offenses appears, if anything, to be even broader than the military rules. For example, Fed.R.Crim.P. 8(a) provides:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are *of the same or similar character* [7] or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(Emphasis added).

The federal rule on "Relief From Prejudicial Joinder," Fed.R.Crim.P. 14, provides, in pertinent part:

*If it appears that a defendant or the government is prejudiced by a joinder of offenses* ... in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, ... or provide whatever other relief justice requires.

(Emphasis added.)

Contrary to appellant's assertion, we are not persuaded that the federal rules, taken as a whole, are materially different from the military's "manifest injustice" rule. For example, it is said that "[s]everance is within the discretion of the trial court and is required only in cases of *compelling prejudice.*" *United States v. McIntosh,* 655 F.2d 80, 84 (5th Cir.1981) (emphasis

added), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982). *See also United States v. Yates,* 734 F.2d 368, 369 (8th Cir.1984) ("clear prejudice"), *cert. denied,* 471 U.S. 1022, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985); *United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985) ("clear and substantial prejudice").

In addition, consistent with the comments in the Discussion following RCM 601(e)(2) and 906(b), the federal courts "balance the prejudice to the defendant against the interests of judicial economy." *United States v. Benz,* 740 F.2d 903, 911 (11th Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985); *United States v. Forrest,* 623 F.2d 1107, 1115 (5th Cir.), *cert. denied,* 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980). Furthermore, "[w]here evidence that ... [an accused] had committed one crime would be probative and thus admissible at the ... [accused's] separate trial for another crime, ... [the accused] does not suffer any additional prejudice if the two crimes are tried together." *United States v. Ferguson,* 776 F.2d at 225; *see also United States v. L'Allier,* 838 F.2d 234, 241–42 (7th Cir. 1988).

Returning to the facts of the instant case, it would ordinarily seem inconceivable that a person of sound mind could do this sort of thing to a child, let alone his own, and there is no hint that appellant was anything other than sane. In a sense, it was this very incomprehensibility that the defense sought to exploit in attempting to raise doubt as to premeditation and intent.

Regarding the 1976 death of Kirky, the defense's position was that the evidence failed to prove that appellant killed the child. In other words, the coroner's finding of "accidental" death was correct. In-

---

7. *See, e.g., United States v. McCoy,* 848 F.2d 743, 744 (6th Cir.1988) (trial judge did not abuse his discretion in denying motion for severance of count alleging armed robbery of bank in Middleton, Ohio, on November 7, 1986, from count alleging unarmed robbery of bank in Forest Park, Ohio, on December 22, 1986); *United States v. L'Allier,* 838 F.2d 234, 241–42 (7th Cir. 1988) (trial judge did not abuse her discretion in

denying motion for severance of counts alleging robberies of same bank on October 29, 1984, and April 22, 1985, where similarities between robberies established *modus operandi* and would have made evidence of one robbery admissible in trial of the other); *United States v. Lindsey,* 782 F.2d 116 (8th Cir.1986) (17–month interval between unlawful possession by felon of pistol and shotgun).

ferentially at least, appellant stood by the last story that he carelessly placed the plastic garment wrapper too near the baby; that the baby suffocated himself; that after reviving the baby with CPR, appellant returned to watching TV without seeking medical assistance; whereupon the baby died. Regarding the 1987 death of Erik, the defense position was that appellant saw the baby go limp and, in a state of panic, he shook the baby too hard—negligently at most, but certainly not intentionally.

We do not here propose to state a comprehensive theory on the admissibility of evidence of other crimes. *See generally* Mil.R.Evid. 404(b), Manual, *supra; United States v. Gamble,* 27 MJ 298 (CMA 1988); *United States v. Hicks,* 24 MJ 3 (CMA), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987); *United States v. White,* 23 MJ 84 (CMA 1986); *United States v. Hogan,* 20 MJ 71 (CMA 1985). We make no pronouncement beyond these facts. However, on these facts we hold that, when Eric Lee Curry died violently at appellant's hands in 1987, with appellant claiming accident or negligence, the Government could have rebutted with evidence that, in 1976, he deliberately and with premeditation murdered another abused child—while also claiming accident or negligence. Conversely, regarding the death of Kirklan Lee Curry in 1976, which by appellant's account was the result of mere carelessness and inconceivable indifference, the Government could have rebutted with evidence that, 11 years later, he deliberately and with premeditation murdered another abused child—and claimed accident or negligence.

In neither case would the evidence be admissible to show that appellant was a bad man or had a predisposition to murder children. We do not suggest that the evidence would have been admissible directly to prove intent or premeditation. However, a powerful, built-in theme running through both of these tragedies was the suggestion that a father simply would not intentionally do this unimaginable thing to his child. Under these circumstances, we believe it permissible and fair for the Government in each instance to *rebut* with evidence that, on another occasion, to another child, appellant did the unimaginable.

Of course, the military judge made no such finding of admissibility in this case, and considering his ruling, there was no occasion to. He was satisfied that the court-martial, properly charged, could keep these matters separate, and he may be right. Arguably, we could uphold the military judge's ruling on the ground that he did not abuse his discretion. We wish to make clear that the rules regarding admissibility of uncharged misconduct do not become the primary test for severance. That remains as expressed in RCM 601(e)(2) and 906(b). However, when such evidence would be admissible, it becomes more difficult to conclude there is "manifest injustice," or "compelling," "clear," or "substantial" prejudice. In the instant case, even if the severance rules initially indicated separate trials, we are satisfied that appellant was not prejudiced because the other-crime evidence would have been admissible. Mil.R.Evid. 404(b).

### Cumulative Error

This issue consists of a checklist of alleged errors in appellant's view. They include trial counsel's supposed comment on appellant's silence, during opening argument, when trial counsel stated that the evidence would show that appellant looked away from one of the doctors who was questioning him when he brought in Erik and that appellant would not answer the doctor. The military judge cured this error, if any, by giving an immediate instruction to the members not to attach any significance to appellant's silence.

Another contention is that evidence of appellant's uncharged misconduct directed against his first wife, Beth, was calculated to inflame the court members' passions against appellant. This was "cured" by the judge's ruling that the evidence was admissible and by an instruction given during the testimony that such evidence was

"introduced for the limited purpose of its tendency, if any, on the issues of motive, intent, state of mind, or accident and for no other purpose whatsoever."[8]

■ Other complaints involve witness comments on appellant's unusual demeanor at the time of the deaths of both children. These are again cited as comment on appellant's right to remain silent. Another relates to the fact that one bit of uncharged misconduct described by a witness was not previously disclosed to the defense (or known to the prosecution). Another concerns the fact that, during a demonstration by a doctor on a doll of the force necessary to inflict the injuries on Erik, the doll's head fell off in the courtroom. The remaining complaints are of the same ilk.

Considering the evidence before the court-martial, none of these complaints, individually or in combination, were significant. Either there was no "error" at all, or the military judge promptly and effectively remedied each situation. We are satisfied that appellant's "substantial rights" were not "materially prejudice[d]." Art. 59(a), UCMJ, 10 USC § 859(a).

### Effectiveness of Counsel

■ Appellant's final allegation is that civilian defense counsel was ineffective in failing to submit post-trial clemency matters to the convening authority. RCM 1105.

The convening authority referred the charges to the general court-martial as a capital case. Appellant was spared the death penalty when the court-martial returned non-unanimous findings of guilty of premeditated murder. RCM 1004(a)(2). After findings, appellant stated on the record that he had instructed defense counsel not to present matters in extenuation and mitigation of sentence. No post-trial clemency submission was made by the defense to the convening authority.

Before the Court of Military Review, appellant submitted an affidavit, the substance of which alleges:

Immediately following my Trial, my civilian attorney, Mr. Joel Cohen, stated to me, "There is no reason to submit anything to the Convening Authority because he is the one who referred it Capital."

I paid him Ten Thousand Dollars ($10,000.00), so I assumed that he knew what he was doing. Nothing was submitted to the CA in my defense.

Mr. Cohen's response, received by the Court of Military Review as an appellate exhibit, states in part:

3. Sfc Curry was advised of his post-trial and appellate rights to include his right to present matters to the Convening Authority;

4. It is true that I informed Sfc Curry, in the presence of military counsel, that, although the Convening Authority was the first step in the appellate process and, notwithstanding the fact that the Convening Authority had the discretion to disapprove the findings and/or sentence or to reduce the sentence, it was my opinion that the Convening Authority would approve the findings and sentence as adjudged;

5. It is still my opinion that the Convening Authority would not have taken any clemency action in this case. My opinion is based on the fact that Sfc Curry's record of military service had been before the Convening Authority before referral; during discussions between the Convening Authority and the SJA on allocating funds to exhume Sfc Curry's son; during the discussions between the Convening Authority and the SJA on the informal defense pretrial agreement proposals; and because we were not made aware of any significant contributions to the military that were not contained in the military records already introduced at trial;

6. Nevertheless, Sfc Curry was told that he could and should submit any matters to the Convening Authority he thought might be helpful and that we, as

8. *See* n.3, *supra.*

his counsel, would assist him in these efforts.

Appellant has not denied these assertions by civilian counsel. He has not indicated what other matters he would have submitted to the convening authority, and he has not claimed that he asked counsel to submit any matters to the convening authority. In this regard, appellant's position appears to be consistent with his desires before the court-martial.

The Court of Military Review is a court empowered to "affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Art. 66(c), UCMJ, 10 USC § 866(c). Before the Court of Military Review, appellant similarly attacked his civilian defense counsel for failing to submit clemency matters. Nevertheless, appellant submitted no matters to that court for sentence consideration that had not been thoroughly presented earlier in the record of trial.

We have reviewed this court-martial record thoroughly. We detect *no* insufficiency or failure of judgment on the part of defense counsel. To the contrary, the record attests to his professional, diligent, competent, and zealous performance throughout.

That appellant stands convicted of two heinous offenses and sentenced to life imprisonment is a result of the evidence of his crimes. The court below has determined that the adjudged sentence is appropriate, considering all the facts and circumstances. The last granted issue is without merit.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.